**Dennis SELL and Edward Konder,
Appellees,**

v.

**Robert F. PARRATT, Warden, Nebraska
Penal and Correctional Complex, et
al., Appellants.**

**No. 76–1307.**

United States Court of Appeals,
Eighth Circuit.

Submitted Nov. 10, 1976.

Decided Feb. 2, 1977.

Melvin K. Kammerlohr, Asst. Atty. Gen., Lincoln, Neb., for appellant; Paul L. Douglas, Atty. Gen., Lincoln, Neb., on brief.

Alan Saltzman, Associate Professor of Law, University of Detroit, Detroit, Mich., for appellee.

Before GIBSON, Chief Judge, VAN OOSTERHOUT, Senior Circuit Judge, and HENLEY, Circuit Judge.

HENLEY, Circuit Judge.

In September, 1973 Dennis Sell and Edward Konder, plaintiffs in the district court, were inmates of the Nebraska Penal and Correctional Complex and were in the immediate custody of the Warden of that institution who is a subordinate of the Director of the Nebraska Department of Correctional Services.[1] During that month subordinate prison personnel found Sell to be in possession of $463.00 in United States currency, and plaintiff Konder was found to have $40.00 concealed in his locker. Pursuant to prison rules and regulations, the money was immediately seized and summarily confiscated without hearing and was deposited in the Inmates Welfare Fund of the prison.

Additionally, Sell had good time taken away from him and was changed in status from a minimum custody inmate to a medium custody inmate. Konder was required to spend a period of time in a disciplinary cell. Apparently, neither plaintiff was afforded a hearing with respect to the punishment imposed upon him, including the seizure and confiscation of the money that was found in his possession.

In 1974 Sell and Konder commenced this action in the United States District Court for the District of Nebraska seeking return of the moneys in question and for appropriate declaratory and injunctive relief. The defendants were the Warden, the Acting Director of the Department, and the subordinate prison employees who had effected the actual seizures. Subject matter jurisdiction was predicated upon 28 U.S.C. § 1343 and 42 U.S.C. § 1983. Plaintiffs also invoked the pendent jurisdiction of the district court.

While the defendants denied that they had deprived the plaintiffs of any property without due process of law and contended that the rules and regulations under which they operated were valid, they admitted the factual allegations of the complaint, acceded to a number of requests for admissions propounded by plaintiffs and answered interrogatories in a manner favorable to the plaintiffs. The defendants propounded interrogatories to the plaintiffs inquiring as to the source of the moneys and as to the circumstances in which the moneys were acquired. Plaintiffs objected to those interrogatories and ultimately their objections were sustained by the district court.[2]

On July 30, 1975 plaintiffs moved for summary judgment pursuant to Fed.R. Civ.P. 56. In February, 1976 the district court filed a thorough memorandum opinion and entered an order granting the motion. The district court adjudged that the money taken from Sell be returned to him, and that the money taken from Konder be credited to his account on the prison books to be returned to him upon his release from prison.[3]

For reversal, the defendants contend, as they contended in the district court, that the prison rules under which the two sums of money were seized and confiscated were reasonable and valid rules, that "free world money" in the hands of Nebraska convicts is contraband, and that plaintiffs had no property rights in the money which came under the protection of the fourteenth amendment. As indicated, the district court rejected those contentions. We affirm.

There is no dispute about the facts of the case, which have been outlined already, nor

1. In 1973 and 1974 Charles L. Wolff, Jr. was Warden of the Complex; he has been succeeded in office by appellant Robert F. Parratt, the present Warden. When the suit was filed in 1974 Don Best was the Acting Director of the Department; he has since been succeeded by Director Joseph Vitek, who appears here as an appellant.

2. The Honorable Warren K. Urbom, Chief United States District Judge.

3. Affidavits from the respective plaintiffs which accompanied their motion indicate that as of July 30, 1975 Sell had been paroled, had served his parole period, and had been discharged from parole custody. As of that time Konder was at liberty on parole. In view of the language of the order of the district court, it appears that Konder was later returned to the Complex.

is there any dispute about the provisions of relevant Nebraska statutes or about the prison rules and regulations under which the defendants, including the subordinate prison employees, acted.

The Nebraska prison system consists of a number of facilities under the jurisdiction of the Department of Correctional Services, which is administered by a Director. Each of those facilities, including the Penal and Correctional Complex, is under the immediate control of a Warden, and he, of course, has a number of subordinate employees with different ranks and duties.

R.S.Neb. § 83–173 provides that the Director shall, among other things: (1) Supervise and be responsible for the administration of the Department. (2) Establish and administer policies and programs for the institutions under his control and for the custody, control, safety, correction and rehabilitation of inmates of the several institutions subject to his jurisdiction. (3) Appoint and remove the chief executive officer of each institution and subordinate employees and delegate to them appropriate powers and duties. (4) Make rules and regulations for the management, correctional treatment and rehabilitation of inmates and for the administration of facilities and the conduct of officers and employees under his jurisdiction.

R.S.Neb. § 83–185 relates to the punishment of inmates for infractions of prison rules. Insofar as here pertinent, the section is as follows:

(1) The chief executive officer of each facility shall be responsible for the discipline of those persons committed to the Division of Corrections who reside therein. No person shall be punished except upon the order of the chief executive officer of the facility; nor shall any punishment be imposed otherwise then in accordance with this section.

(2) Except in flagrant or serious cases, punishment for misconduct shall consist of deprivation of privileges. In cases of flagrant or serious misconduct, the chief executive officer may order that a person's reduction of term as provided in section 83–1,107 be forfeited or withheld and also that the person be confined in a disciplinary cell. The chief executive officer may order that such person, during all or part of the period in a disciplinary cell, be put on an adequate and healthful diet. A person in a disciplinary cell shall be visited at least once every eight hours. No cruel, inhuman or corporal punishment shall be used on any person.

(3) The chief executive officer shall maintain a record of breaches of discipline, of the disposition of each case, and of the punishment, if any, for each such breach. Each breach of discipline shall be entered in the person's file, together with the disposition or punishment therefor.

R.S.Neb. § 83–417 is as follows:

If any person employed at the Nebraska Penal and Correctional Complex, in any capacity, shall willfully and negligently suffer any prisoner to go at large, or be visited, conversed with, comforted or relieved within the prison, or shall convey to or from any prisoner any communication, newspapers, matches or any article without the approbation of the warden, he shall upon conviction thereof be punished by a fine not exceeding one thousand dollars or by imprisonment in the Nebraska Penal and Correctional Complex not exceeding ten years.

And R.S.Neb. § 28–201 provides that whoever aids, abets, or procures another to commit any offense may be prosecuted and punished as though he were the principal offender.

The record reflects that when an individual is committed to the Complex and is received thereat, he is thoroughly searched and is required to turn over items of personal property, including money, to prison personnel. He is given a receipt for such items, and presumably they are returned to him when he is released from the institution. If an inmate with money in his possession desires to have it transmitted to a third person in the civilian world, that will be done.

While an inmate is confined in the institution, he is not permitted to have money in his possession in any circumstances, or directly and personally to receive money from others. His day-to-day commissary needs may be met by means of color coded scrip which is issued by the institution and which an inmate may possess in limited amounts.

If an inmate is found in possession of money, he is deemed guilty of a serious disciplinary offense and may be severely punished. In addition, the money found in his possession is summarily taken away from him and is confiscated in the sense that it is deposited in the Inmates Welfare Fund which is a fund maintained for the benefit and welfare of all inmates. Once money taken from an inmate is placed in the Welfare Fund, it is lost to him as effectively as though it had been paid over into the general state treasury, and although the inmate may derive some benefit from the Fund as an inmate, that benefit is not directly connected with the particular money that was taken from him and placed in the Fund.

When money is found in the possession of an inmate, the seizure and confiscation of it are both summary and final and are not subject to later administrative review. Although the inmate may be afforded a hearing in connection with the final disposition of the disciplinary charge against him, and in the course of it may be called upon or given an opportunity to explain how he came to be in possession of the money, there is no way in which he can retrieve the money, either immediately or ultimately, from the Welfare Fund. As far as the inmate is concerned, the money is simply lost.

In the course of the discovery proceedings it was admitted by the defendants that the confiscation of free world money found in the possession of an inmate is punitive in nature and is in addition to other punishments that may be imposed upon the inmate on account of his having been in possession of the money in the first place.

█ Let it be made clear at the outset of discussion that no one questions the right of a state to forbid its convicts to have money in their possession while undergoing confinement and may take away from them money that is found in their possession. In this connection in *Holt v. Hutto*, 363 F.Supp. 194, 210 (E.D.Ark.1973), *rev'd. on other grounds, Finney v. Arkansas Board of Correction*, 505 F.2d 194 (8th Cir. 1974), the district court said:

> . . . It has long been prison policy to prohibit inmates from having in their possession what is called "free world" or "green" money. The reasons for the prohibition are obvious. An inmate with currency in his possession may be the subject of attack by other inmates; an inmate with funds is in a better position to escape than an inmate who has no money; the money in the possession of an inmate may be used to bribe guards or other prison employees.

That right of the state was expressly recognized by the district court in the instant case and is not involved here. The question is whether those in charge of the Nebraska penal system can lawfully and constitutionally deprive an inmate permanently of money found in his possession regardless of its source and regardless of the circumstances of the possession. In the course of its opinion the district court said:

> Much of the state's argument relates to the power of the Penal Complex to remove the money from a prisoner in the first place. I have not doubted that the Penal Complex can remove such money. Some very valid state interests are served by not allowing prisoners to keep money on their person while they are in prison. But the state's keeping it permanently or giving it away is quite another matter.

In deciding the case the district court first addressed itself to the question of whether at the time of the seizure the respective plaintiffs had such an interest in the moneys seized as would amount to "property rights" protected by the fourteenth amendment.

Citing *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972),

and *Mitchell v. W. T. Grant Co.*, 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974), the district court held that the question of whether plaintiffs' interest in the moneys constituted "property" shall be determined by reference to Nebraska law. The district court concluded that under Nebraska law the plaintiffs' possession of the currency gave them at least a possessory interest in it on the basis of which they could defend their possession against the claim of anyone not having a superior right or title, and the district court also concluded that this possessory interest was "property" within the meaning of the fourteenth amendment.

We accept the conclusion of the experienced district judge on the question of Nebraska law, and we also agree with him that if the interests of the plaintiffs in the money amounted to "property," as the district judge held that they did, that property would ordinarily fall within the protection of the fourteenth amendment.

The district court next concluded that plaintiffs were entitled to invoke the protection of the amendment in this action notwithstanding the fact that they were convicts and notwithstanding the fact that the moneys had been taken from them by prison officials purporting to act under rules and regulations for the proper governance of the prison and the inmates thereof.

In so holding, the district court took note of *Kimble v. State of Michigan Correction Department*, 300 F.Supp. 1122 (E.D.Mich. 1968), *aff'd.* 411 F.2d 990 (6th Cir. 1969), and *Howard v. Swenson*, 426 F.2d 277 (8th Cir. 1970), cited by counsel for the defendants. The district court was of the opinion that the "hands off" policy expressed in those cases is no longer valid in the light of decisions of the Supreme Court in *Haines v. Kerner*, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972), and *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

In *Lynch v. Household Finance Corp.*, 405 U.S. 538, 92 S.Ct. 1113, 31 L.Ed.2d 424 (1972), the Supreme Court rejected the idea that there is any distinction, as far as suits under § 1983 are concerned, between personal liberties and proprietary rights. In *Cruz v. Cardwell*, 486 F.2d 550, 551 (8th Cir. 1973), we applied *Lynch, supra*, to uphold a civil rights complaint filed by an individual who claimed that a local sheriff had wrongfully failed to return to him money that the sheriff had taken when the plaintiff was arrested. *See also Sigler v. Lowrie*, 404 F.2d 659 (8th Cir. 1969). Recent cases from other circuits holding that convicts may invoke § 1983 in cases involving property rights include *Hansen v. May*, 502 F.2d 728 (9th Cir. 1974), and *Russell v. Bodner*, 489 F.2d 280 (3d Cir. 1973).

Defendants contend that the cases just cited are distinguishable from this case in that in those cases the property involved rightfully belonged to or was rightfully in possession of the individual plaintiffs when it was taken away from them or not returned to them. As to the instant case, defendants say that the moneys taken from the plaintiffs were contraband, that plaintiffs' possession of the funds was unlawful, and that they had no property rights in them. We reject that argument.

It is familiar law that possession of property is of two kinds, actual and constructive. Granting that the prison authorities had the right to deprive the plaintiffs of the immediate actual possession and enjoyment of the funds in question, the exercise of that right did not necessarily destroy the right of the plaintiffs to have the funds deposited to their accounts on the prison books or held for ultimate return to them and thus remain in their constructive possession. And the assertion by the defendants that they had a right not only to take the moneys away from plaintiffs temporarily but also to confiscate them permanently is what brought about this lawsuit.

Having determined that the plaintiffs had a property right in the moneys taken from them, and that they could seek to vindicate that right in this proceeding, the district court proceeded to a consideration of the ultimate question of the validity of the permanent confiscation of the sums involved in the case.

The district court held that the confiscation was punitive in nature and amounted to a forfeiture, a proceeding which is not favored by the law. It also held that a forfeiture requires statutory authority, and that the Nebraska statutes which have been mentioned do not authorize any forfeiture of property as a punishment of inmates of the Complex who violate prison rules or who may be involved one way or another in a violation of § 83–417.[4] And on the basis of those holdings the district court concluded that the confiscations could not be sustained, and that the moneys would have to be returned to the plaintiffs.[5]

We think that the district court without reaching the federal constitutional question raised by the plaintiffs might well have based its decision on the proposition that simply as a matter of Nebraska law an administrative agency of the state, like the Department of Correctional Services, may not forfeit property used or possessed in violation of agency rules and regulations unless the power to effect such a forfeiture is expressly, or at least by fair implication, conferred by the statutes of the state, and that in the absence of statutory authority the Department had no authority to confiscate permanently the currency that was taken from the plaintiffs.

It seems, however, that the district court was of the opinion that a forfeiture or confiscation of the kind involved here is violative of due process of law unless authorized by statute. In support of its view the district court cited the following cases: *United States v. One Ford Coach*, 307 U.S. 219, 59 S.Ct. 861, 83 L.Ed. 1249 (1939); *United States v. Lane Motor Co.*, 199 F.2d 495 (10th Cir. 1952), *aff'd.* 344 U.S. 630, 73 S.Ct. 459, 97 L.Ed. 622 (1953); *United States v. Charles D. Kaier Co.*, 61 F.2d 160 (3d Cir. 1932); and *King v. United States*, 292 F.Supp. 767 (D.Colo.1968), a case that involved a controversy about the rifle with which President Kennedy was assassinated.

Speaking of the underlying authority for forfeitures in the United States the district court in *King, supra*, had this to say (292 F.Supp. at 772):

> Forfeiture is quite different from condemnation in that the latter requires the payment of just compensation. *United States v. One 1962 Ford Thunderbird*, 232 F.Supp. 1019, 1022 (N.D.Ill.1964), and 37 C.J.S. Forfeiture § 4.
>
> Although there may be such a thing as judicial forfeiture, it does not occur until there has been a conviction and the court has decreed that the property of the person convicted is forfeited to the government. Furthermore, such a remedy would obtain only in respect to instruments of the crime and perhaps contraband. See 37 C.J.S. Forfeiture § 1 et seq.; 3 A.L.R.2d 738, §§ 1–2.
>
> Statutory forfeiture on the other hand is a civil action which becomes effective as of the date of the act prohibited by the statute. *United States v. Stowell*, 133 U.S. 1, 16–17, 10 S.Ct. 244, 33 L.Ed. 555 (1890). A conviction is not a prerequisite. Judicial forfeiture has had little acceptance in the United States, and it is generally held that the remedy must be through statutory proceedings. [Footnote omitted.]

Thus, in *United States v. Lane Motor Co.*, 199 F.2d 495 (1952), aff'd, 344 U.S. 630, 73 S.Ct. 459, 97 L.Ed. 622, the Court of Appeals for the Tenth Circuit said:

> "Proceedings of this kind instituted by the United States for the forfeiture of property are essentially statutory proceedings, and they cannot be maintained unless authorized by an applicable statute. *United States v. Charles D. Kaier Co.*, 3 Cir., 61 F.2d 160." 199 F.2d at 496–497.

---

**4.** It is doubtful that § 83–417 was designed to reach to transactions between or among inmates. The principal purpose of the statute was to prohibit improper communications and dealings between civilians, on the one hand, and inmates, on the other.

**5.** In this view of the case it was irrelevant where or how the plaintiffs obtained the moneys, and it was evidently on this basis that the district court sustained the plaintiffs' objections to the defendants' interrogatories which sought to obtain information in that area.

This case does not present any question of "judicial forfeiture." With regard to statutory forfeitures the Supreme Court in *United States v. One Ford Coach, supra,* 307 U.S. at 226, 59 S.Ct. at 865, said that forfeitures are not favored and "should be enforced only when within both letter and spirit of the law."

In view of the cases that have been cited we think that the district court correctly held that an administrative agency has no right without underlying statutory authority to prescribe and enforce forfeitures of property as punitive measures for violations of administrative rules and regulations, and that when an agency does so, it violates the due process clause of the fourteenth amendment.

It may be argued with a good deal of force that in the case of convicts a mere temporary separation of a convict from money in his possession and a conventional disciplinary punishment for having possessed the money in violation of prison rules are not sufficient sanctions to deter prison inmates from seeking to acquire and enjoy money while in confinement. And we do not hold that a state legislature may not constitutionally provide by statute that such money shall be permanently confiscated, provided that the forfeiture proceedings are surrounded by adequate procedural safeguards, and provided that inmates who are found with money in their possession are given some opportunity to justify their possession notwithstanding their apparent violation of prison rules.

The judgment of the district court is affirmed.