Douglas LOWERY

v.

Julius T. CUYLER.

Civ. A. No. 80–0046.

United States District Court,
E. D. Pennsylvania.

Sept. 9, 1981.

Richard Eppinger, Philadelphia, Pa., for plaintiff.

Marc G. Brecher, Deputy Atty. Gen., Philadelphia, Pa., for defendant.

## MEMORANDUM AND ORDER

EDWARD R. BECKER, District Judge.

Narrowed to its essentials, this case presents a single discrete issue of constitutional law in a prison setting: whether a prison regulation providing for confiscation of contraband money can constitute a due process violation. The issue is before us on cross-motions for summary judgment; there is no factual dispute relevant to the constitutional question.

Plaintiff is an inmate at the State Correctional Institute at Graterford (SCIG). On July 2, 1980, during a routine cell search, cash totalling $1,045 was discovered, confiscated, and deposited in the Inmate Welfare Fund pursuant to prison policy.[1]

---

1. Defendant Cuyler, the prison superintendent, describes the incident in detail in his motion papers, supported by appropriate exhibits. The facts may be summarized as follows:

On July 2, 1979, at approximately 10:05 p. m. one sergeant and three correctional officials employed at Graterford were directed to conduct a routine search of plaintiff's cell. When plaintiff was told that his cell was to be searched he jumped from his bed and attacked the officers with a typewriter case. The plaintiff was then subdued, handcuffed, and forcibly removed from his cell.

After plaintiff was removed from his cell, two correctional officers conducted a search of the cell. They recovered eight hundred forty dollars ($840.00) on the plaintiff's bed, as well as seventeen institutional money transmittal envelopes containing a substance suspected [and later determined] to be marijuana, a strip of sandpaper, and twenty-nine empty money transmittal envelopes.

In this action, brought pursuant to 42 U.S.C. § 1983 against the superintendent, plaintiff is seeking return of that cash.

The possession of money by an inmate within the confines of a Pennsylvania State Correctional Institution is prohibited by prison regulation. Money is defined as confiscatable contraband in the Inmate Handbook, which all inmates receive when they enter the prison, as well as in a Bureau of Correction Administrative Memorandum entitled "Confiscation of Contraband Money." [2] When an inmate is received at SCIG all of his money is placed in an inmate account under his name, and any salary an inmate earns while at SCIG is placed directly in his inmate account. Inmates pay for items purchased in the institutional commissary by using "cash slips" which are deducted in advance from their inmate accounts. [3]

Meanwhile, plaintiff had been taken to the restricted housing unit, where he was strip searched. During the search plaintiff reached into his shorts and pulled out a roll of money totalling $205.00.

Plaintiff was given four separate misconducts as a result of these incidents: one for attacking the correctional officers with a typewriter case, and the remaining three for possession of contraband: (1) the $840 found in his cell; (2) the sandpaper, seventeen money transmittal envelopes filled with a grassy substance, and 29 empty money transmittal envelopes; and (3) the $205 uncovered during the strip search. Following hearing on July 5, 1979, plaintiff was found guilty of all four offenses; his punishment totalled fifteen months punitive confinement in the RHU, and the currency was confiscated and placed in the Inmate Welfare Fund.

Plaintiff was also criminally charged with assault as well as with violating the Pennsylvania controlled substance act for possessing with intent to distribute the marijuana found in his cell. He pleaded guilty to violating the Pennsylvania controlled substance act, the Commonwealth nol prossed the assault charges, and he was sentenced to serve six months to one year in the state penitentiary.

Plaintiff does not seriously contest these facts, although he does characterize the implication that plaintiff acquired the confiscated money through marijuana sales as "unsubstantiated allegation" and avers in his complaint that the money had been saved during his 15-year imprisonment. In any event, we agree with plaintiff that the manner in which the money came into his possession is irrelevant to the narrow issue before us.

Plaintiff contends that the regulations and policies that result in forfeiture of contraband currency deprive him of his property without due process of law. [4] He relies in this regard on *Sell v. Parratt,* 548 F.2d 753 (8th Cir.), *cert. denied,* 434 U.S. 873, 98 S.Ct. 220, 54 L.Ed.2d 152 (1977). *Sell* held that, under Nebraska law, inmates' possession of money gave them a property interest protected within the meaning of the Fourteenth Amendment, and that confiscation of that property was "punitive in nature and amounted to a forfeiture, a proceeding which is not favored by the law." *Id.* at 758. The Court further held that: (1) because a forfeiture requires statutory authority and Nebraska statutes did not specifically authorize forfeiture as punishment for violation of prison regulations, the confiscation could not be sustained; and (2) when an agency works a forfeiture without

2. The Administrative Memorandum provides in part:
   I. *PURPOSE*
   In most instances money within a state correctional institution is considered contraband. It is the purpose of this Administrative Memorandum to provide guidelines for the confiscation and proper disposition of such contraband money.
   II. *PROCEDURES*
   A. Money in a state correctional institution is contraband and its possession by an inmate is a misconduct in accordance with provisions of BC–ADM 801.
   B. After a proper hearing on the misconduct the money shall be forfeited as contraband and placed in the Inmates' General Welfare Fund.
   C. Under no circumstances shall the money be credited to any inmate's account nor can any inmate lawfully acquire title to contraband money while incarcerated in a state correctional institution.

3. When money is sent to an inmate from outside the institution, it is usually in the form of a money order or check, which is taken to the inmate's block, endorsed by the inmate, and then sent to the mail room, where a cash remittance slip is made up. The cash remittance slip and check or money order are then sent to the business office and credited to the inmate's account.

4. Plaintiff apparently does not dispute that currency may be designated as contraband; he disputes only the consequence of possessing contraband currency—i. e., the confiscation.

statutory authority, it thereby violates the due process clause.[5]

Plaintiff points to the lack of express statutory language authorizing confiscation of currency from prisoners in Pennsylvania and urges that we follow *Sell.* Defendant, on the other hand, invokes the provisions of 71 P.S. § 306, an enabling statute which authorizes the "Boards of Trustees of each state correctional institution and the Commissioner of Correction to promulgate by-laws, rules and regulations for the management of state prisons, with the approval of the Department of Justice."[6] In the Commonwealth's view, there is no necessity for specific statutory authorization to enable the Bureau of Correction to permanently confiscate money found in the possession of inmates since the designation of what items constitute contraband and the appropriate disposition of contraband are left to the Commissioner of Correction under that statute.

■ Defendant also argues that inmates have no property interest in contraband, since they hold it illegally, and that the confiscation is plainly permissible, citing *Kimble v. Department of Corrections,* 411 F.2d 990 (6th Cir. 1969) in support of this position. In *Kimble,* the Sixth Circuit held that the confiscation by prison officials of the sum of $350 seized from an inmate's person[7] was within the regulatory power of prison officials and did not constitute a due process violation. Finally, defendant points out that Pennsylvania has made it a misdemeanor to give money to an inmate, 18 Pa.C.S. § 5123(b). That statute, it is suggested, makes it plain that an inmate has no property interest under Pennsylvania law in contraband monies,[8] and also serves to satisfy the *Sell* "statutory authority" test. For the reasons which follow, we will grant summary judgment for the defendant.

As we see the case, the core question before us concerns the nature of the interest of which plaintiff has been deprived. In essence, the question is whether a state prison system may define the property in which an incarcerated inmate may gain an interest after his incarceration. If it can, and if an inmate is not permitted to acquire certain items, he can have no property interest in such items, and they would therefore not be protectible within the meaning of the Fourteenth Amendment. The "forfeiture" question would be irrelevant, for there would be no protectible property interest in the "forfeited" items.

■ We think that this is the correct approach, hence we see this not as a "property interest/due process" case but as a "conditions of confinement" case. As such, it is controlled by the post-*Sell* case of *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), which teaches that courts should accord great deference to de-

---

5. Similarly, in *Sullivan v. Ford,* 609 F.2d 197 (5th Cir.), *cert. denied,* 446 U.S. 969, 100 S.Ct. 2950, 64 L.Ed.2d 829 (1980), statutory authority was held to be necessary before currency could be confiscated from inmates, but that authority was found in Florida law. *Cf. Hanvey v. Blankenship,* 474 F.Supp. 1349 (W.D.Va.1979), where the court distinguished *Sell* on the ground that Va.Code Ann. § 53–23.1 confers upon the Board of Corrections the power to denote "any items of personal property, tangible or intangible" as contraband.

6. According to a memorandum filed by the Commonwealth, it appears that: (1) prior to 1955 the Bureau of Correction was an agency under the Department of Public Welfare; (2) in 1955, pursuant to an executive reorganization plan, the Bureau was moved to the Department of Justice; and (3) in 1955 the Boards of Trustees of each state correctional institution, which had been permitted by the concluding paragraph to 71 P.S. § 306, were abolished by executive proclamation. 71 P.S. § 306 remained unchanged until January 20, 1981, when the Commonwealth Attorneys Act became effective. *See* 71 P.S. § 732–101 *et seq.* This Act transferred the duties of the Department of Justice under 71 P.S. § 306 to the Office of General Counsel to the Governor. *See* 71 P.S. § 732–502.

7. The inmate claimed that the money was accumulated over a period of eight months from the sale of cigarettes.

8. Property interests are creatures of state, not constitutional, law. *See Parratt v. Taylor,* —— U.S. ——, 101 S.Ct. 1908, 1910 n.1, 68 L.Ed.2d 420 (1981); *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

cisions made by correctional officials concerning the security needs of their institutions. The Supreme Court in *Wolfish* began with the proposition that convicted prisoners do not forfeit all constitutional protections by reason of their confinement, but noted that "simply because prison inmates retain certain constitutional rights does not mean that these rights are not subject to restrictions and limitations." 441 U.S. at 545, 99 S.Ct. at 1877. Institutional security and internal order and discipline were viewed as "essential goals that may require limitation or retraction of the retained constitutional rights" of prisoners. The court explained:

> Prison officials must be free to take appropriate action to ensure the safety of inmates and corrections personnel and to prevent escape or unauthorized entry. Accordingly, we have held that even when an institutional restriction infringes a specific constitutional guarantee, such as the First Amendment, the practice must be evaluated in the light of the central objective of prison administration, safeguarding institutional security . . . .
>
> . . . [The] problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions. Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security. "Such considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters."

*Id.* at 546–48, 99 S.Ct. at 1878–1879; *quoting Pell v. Procunier*, 417 U.S. 817, 827, 94 S.Ct. 2800, 2806, 41 L.Ed.2d 495 (1974) (citations and footnotes omitted).

We can conceive of no clearer mandate to validate the regulation at issue before us. Defendant's justification for the prohibition of money is that it may enable an inmate to purchase contraband from other inmates or staff, to traffic in illegal services such as sex and drugs, to facilitate escape attempts, and to bribe staff. This justification strikes us as most compelling. Moreover, an inmate with money is a ready target of robbery attempts, thereby fostering internal conflict and violence. *See Holt v. Hutto*, 363 F.Supp. 194, 210 (E.D.Ark. 1973), *aff'd in relevant part and rev'd in part*, 505 F.2d 194 (8th Cir. 1974).[9]

The defendant asserts that permanent confiscation, rather than temporary dispossession either by placing the money in an individual inmate account or holding it only until the inmate is released, is essential to the maintenance of prison discipline. Defendant points in this regard to testimony (in an unrelated action) by the former Bureau of Correction Commissioner, William B. Robinson, who initiated the currency regulations, to the effect that cash is a paramount security threat, second only to guns, and that confiscation is the only effective deterrent. Otherwise, it will always be profitable in the long run for inmates to attempt to smuggle cash into the prison, for they would never totally lose it. This position appears to us to be reasonable.

With the deference required by *Bell v. Wolfish, supra*, in mind, we must therefore uphold the prohibition against inmate possession of cash, along with its accompanying confiscation sanction, at issue here. The inmate's countervailing interest in the possession of currency obtained in violation of a plainly legitimate prohibition simply does not provide sufficient weight to make

---

**9.** Indeed, the Supreme Court, in upholding a strip search in *Bell v. Wolfish, supra*, observed: "A detention facility is a unique place frought with serious security dangers. Smuggling of money, drugs, weapons, and other contraband is all too common." 441 U.S. at 559, 99 S.Ct. at 1884. Thus treating money as contraband has plainly been contemplated by the Supreme Court.

the balance even close.[10]  Whether or not 71 P.S. § 306 constitutes independent authority for the confiscation procedure, a question we need not reach, it does buttress the defendant's contention regarding the viability of the regulations.  We believe that *Kimble v. Department of Corrections, supra,* although pre-*Wolfish*, reached the correct result, and we decline to follow *Sell,* which is, at all events, superseded by *Wolfish.*

Defendant's motion for summary judgment must be granted.

---

**10.**  We emphasize that no pre-incarceration cash is involved, for that is deposited in the inmate's personal account.