Nicholas Thomas SAVKO,
#151–867, et al.

v.

James N. ROLLINS, Warden, Md.
Penitentiary, et al.

Civ. No. K–88–2150.

United States District Court,
D. Maryland.

Aug. 7, 1990.

Witold J. Walczak, Norman A. Handwerger and Joseph B. Tetrault, Legal Aid Bureau, Inc., Baltimore, Md., for plaintiffs.

J. Joseph Curran, Jr., Atty. Gen. of Maryland, and Richard Kastendieck, Asst. Atty. Gen. of Maryland, Baltimore, Md., for defendants.

FRANK A. KAUFMAN, Senior District Judge.

Plaintiffs are all prison inmates currently serving in the Maryland state correctional system. Defendants are James N. Rollins, Warden of the Maryland Penitentiary; Bishop L. Robinson, Secretary of the Department of Public Safety and Correctional Services for the State of Maryland; Arnold J. Hopkins, former Commissioner of the Division of Correction; and all officers, agents and employees of the Division of Correction. On August 29, 1988, the Maryland Division of Correction promulgated new regulations, Division of Correction Regulation No. 220–6 (DCR 220–6), specifying the types and quantities of personal property which inmates may possess in their cells in the State's correctional facilities. The new regulation provoked a series of *pro se* complaints from inmates throughout most of the State's confinement institutions. Those claims were consolidated for all purposes in this litigation, and plaintiffs' class was certified pursuant to Federal Civil Rules 23(b)(2).[1] Herein, plaintiffs seek injunctive relief from a range of provisions of DCR 220–6 which are challenged as violative of state inmates' federal constitutional rights.

After this case was instituted, the State agreed to postpone implementation of DCR 220–6 until after this Court ruled concerning the constitutionality of the challenged provisions.[2] Also, through lengthy negotiations, the parties have resolved most of their disputes with regard to the regulation. Nonetheless, certain differences between plaintiffs and defendants continue to exist. As to them, defendants have moved for summary judgment.

The new DCR 220–6[3] promulgated on August 29, 1988 replaced an earlier version of that same regulation. Both the prior and proposed DCR 220–6 (a) designated in detail the types and quantities of personal property which inmates in state prison facilities may possess in their cells and (b) stated procedures for inspection of personal property of inmates kept in cells for confiscation and, if necessary, for disposal of items in excess of those allowed by the regulation and for the conduct of hearings for inmates who challenge the confiscation of their property under the regulation.

The State has stated four reasons for the new regulation: (1) to improve fire and other general safety conditions by limiting clutter in prisoners' cells; (2) to promote cleanliness and hygiene among prisoners; (3) to create a "more stable prison environment" through "increased uniformity of ownership," which officials believe will reduce theft of personal items and use of coercion to obtain property by the inmate population; and (4) to enhance prison se-

1. The following cases were consolidated with this case: Civil Nos. K–88–2153, K–88–2207, K–88–2302, K–88–2309, K–88–2333, K–88–2391, K–88–2407, K–88–2422, K–88–2592, K–88–3242, K–89–1172.

2. Early in this litigation, counsel for the State agreed that the State would delay implementation of the new regulation until after this Court had the opportunity to rule concerning defendants' summary judgment motion filed by the State on August 17, 1989. In early September, 1989, there was apparently some confusion regarding that commitment, and the State began implementation of the new rule in certain facilities. Plaintiffs thereafter filed a motion for a preliminary injunction which became moot when the State agreed again to defer implementation until after this Court ruled with regard to defendants' said motion for summary judgment.

3. The new DCR 220–6, as modified by the State after discussions with counsel for plaintiffs, is set out in full at Appendix A to this opinion.

curity by preventing the common practice of hiding contraband in books and papers.

The new DCR 220–6 imposes greater limitations with respect to some items of property while requiring less stringent limitations on others. Nonetheless, the parties agree that the new regulation is generally more restrictive than its predecessor. Inmates responded negatively to the new rules, as evidenced by their numerous *pro se* complaints filed in this Court challenging the constitutionality of a range of provisions in the regulation.

As a result of the discussions held among counsel after the institution of this case, the State modified DCR 220–6 and introduced implementation guidelines for inventory scheduling; policies and procedures for confiscation hearings to be conducted by specially trained, in-house arbitrators; and a system for the storage of excess legal and religious books and other materials.

The following issues which remain in controversy with respect to the proposed DCR 220–6 are:

1. Whether the proposed limitation of cell space for legal research materials violates the standards set forth in *Turner v. Safley*, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987).

2. Whether the proposed limitation concerning access to written religious materials violates the First Amendment.

3. Whether status quo should be maintained during the Inmate Grievance Commission (IGC) procedure, *i.e.*, that inmates' property will not be removed or destroyed until that procedure has been completed.

4. Whether an inmate is entitled to the proceeds from the sale of his or her property confiscated pursuant to the regulation, and whether the State should incur the cost of mailing excess property to an inmate's designated custodian.

5. Whether the prohibition with regard to in-cell electric hot pots violates the Eighth Amendment and whether that prohibition is a "reasonable" one under the standard set forth in *Turner v. Safley*, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987).

Accordingly, this Court addresses the constitutionality of each of the challenged provisions of the regulation and finds that none of the challenged provisions of DCR 220–6 violates the inmate plaintiffs' constitutional rights.

## I.

Any analysis of prison regulations such as those at issue in the instant case must begin with the axiom that "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our prison system." *Price v. Johnston*, 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948). The Supreme Court has long recognized that "a prisoner is not wholly stripped of constitutional protections when he is imprisoned for crime." *Wolff v. McDonnell*, 418 U.S. 539, 555, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935 (1974). However, a state may limit those constitutional rights "if [such limitation] is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987).

In *Turner*, Justice O'Connor set forth a detailed test to determine whether the requisite reasonable relationship exists. It is that standard which governs the analysis of plaintiffs' challenges to DCR 220–6. Therefore, this Court must first determine whether the regulation infringes upon any constitutionally protected rights, and, if it does, whether that limitation meets the *Turner* requirements.[4]

*Turner* imposes a four-part test. "First, there must be a 'valid, rational connection' between the prison regulation and the legit-

---

**4.** In *Lane v. Griffin*, 834 F.2d 403, 408 (4th Cir.1987), the Fourth Circuit suggested that the inquiry as to whether or not a prison regulation restricting a constitutional right is reasonably related to a legitimate penological interest is a factual one. Accordingly, summary judgment would appear appropriate only if there is no material fact in dispute as to the legitimacy of the avowed governmental interest.

imate governmental interest put forward to justify it." *Id.*, quoting *Block v. Rutherford*, 468 U.S. 576, 586, 104 S.Ct. 3227, 3232, 82 L.Ed.2d 438 (1984). In other words, "where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational," the regulation will not be sustained. *Id.* 482 U.S. at 89–90, 107 S.Ct. at 2262. "Moreover, the governmental objective must be a legitimate and neutral one"; for example, a content-based restriction upon a prisoner's First Amendment rights may fail under that standard. *Id.* at 90, 107 S.Ct. at 2262. Second, courts must consider "whether there are alternative means of exercising the right that remain open to prison inmates," and, where other alternatives are available, courts should be "particularly conscious of the 'measure of judicial deference owed to corrections officials ... in gauging the validity of the regulation.'" *Id.*, quoting *Pell v. Procunier*, 417 U.S. 817, 827, 94 S.Ct. 2800, 2806, 41 L.Ed.2d 495 (1974). Third, courts must take into consideration what "impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." *Id.* Fourth, courts must determine the availability of "obvious, easy alternatives" to the challenged regulation. *Id.* The Supreme Court stopped short of requiring a " 'least restrictive alternative' " test, but asserted that "if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at de minimis cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." *Id.* 482 U.S. at 90–91, 107 S.Ct. at 2262.

In addition to offering reviewing courts a detailed standard by which to review challenged regulations, *Turner* also echoes an overriding general theme of the cases which analyze the constitutionality of prison regulations, namely, appropriate deference to decisions of state prison officials. Justice O'Connor observed that the complexities of prison administration as well as

"separation of powers concerns counsel a policy of judicial restraint," and where a state penal system is involved, federal courts have even more "reason to accord deference to the appropriate prison authorities." *Id.* at 85, 107 S.Ct. at 2259, citing *Procunier v. Martinez*, 416 U.S. 396, 405, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974).

That general principle of deference to prison authorities is at its height when the prison regulations at issue involve security and safety concerns. *Bell v. Wolfish*, 441 U.S. 520, 547, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1979). Such broad deference has been pointedly incorporated by the Supreme Court into the evidentiary standard by which courts are to judge whether a regulation is "reasonably related" to a valid penological purpose:

> In determining whether restrictions or conditions are reasonably related to the government's interest in maintaining security and order and operating the institution in a manageable fashion, courts must heed our warning that "[s]uch considerations are peculiarly within the province and professional expertise of corrections officers, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters.

*Id.* at 540, note 23, 99 S.Ct. at 1875, note 23, quoting *Pell v. Procunier*, 417 U.S. at 827, 94 S.Ct. at 2806 (citations omitted).

In *Bell*, the Supreme Court applied that language to uphold prison regulations which limited mailings of packages to prisoners to one food package per year during the December holiday season and only allowed prisoners to receive books and magazines sent directly from publishers. Justice Rehnquist accepted the state's expressed interests in preventing sanitation problems, reducing theft, gambling and conflicts which arise from the introduction of personal property among prisoners, and eliminating the security risk posed by accepting uninspected packages sent by individuals.[5] " 'It is enough to say that they

---

5. Justice Rehnquist further accepted the State's

contention that the cost associated with inspect-

have not been conclusively shown to be wrong in this view,'" *id.* 441 U.S. at 555, 99 S.Ct. at 1882, quoting *Jones v. North Carolina Prisoners' Labor Union,* 433 U.S. 119, 132, 97 S.Ct. 2532, 2541, 53 L.Ed.2d 629 (1977), the Court concluded, because plaintiffs had failed to show that prison officials either "exaggerated their response to these serious problems or that this restriction is irrational." *Id.*

## II.

■ DCR 220–6 limits the amount of books and other written materials which an inmate may keep in his cell to that which fits within 1.5 cubic feet.[6] Religious and legal materials are subject to that restriction. However, any books and papers in excess of the 1.5 cubic feet limit may be stored at the prison, and inmates may rotate materials from storage to their cells on at least a monthly basis.[7]

Plaintiffs contend that the regulation infringes upon a prisoner's right to access to the courts by impermissibly restricting his or her time and opportunity to work on post-conviction appeals and habeas corpus petitions and by inhibiting inmates from using documents provided by certain other inmates who regularly offer legal assistance to their fellow prisoners. Applying the *Turner* standards to the restrictions of DCR 220–6, plaintiffs argue that the rule is unreasonable because there is no "'valid, rational connection'" between the regulation and any "legitimate governmental interest" justifying it. *Turner,* 482 U.S. at 89, 107 S.Ct. at 2262, quoting *Block v. Rutherford, supra,* 468 U.S. at 586, 104 S.Ct. at 3232. In support of that argument, plaintiffs observe that other prison systems allow more cell space for such materials,[8] that storing books in fire-resistant containers would eliminate any fire hazard, and that the State has not pointed to specific instances where contraband was found inside books or papers in a Maryland

inmate's cell so as to validate the State's security concerns.

In evaluating those assertions by plaintiffs, it is necessary to consider the threshold question of whether the regulation infringes upon any of plaintiffs' constitutionally protected rights. *Id.* The answer is that while DCR 220–6 may somewhat hamper the convenience with which inmates may prepare legal challenges for themselves and other inmates, the regulation does not infringe upon any constitutional rights.

In *Bounds v. Smith,* 430 U.S. 817, 821, 97 S.Ct. 1491, 1494, 52 L.Ed.2d 72 (1977), the Supreme Court observed that "[i]t is now established beyond doubt that prisoners have a constitutional right of access to the courts." That right encompasses the ability to prepare and to submit habeas corpus petitions, and for indigent inmates to receive free trial transcripts, avoid payment of docket fees, and to have counsel represent them when appropriate. *Id.* at 822–23, 97 S.Ct. at 1495.

That right of access also includes the requirement that the State "shoulder affirmative obligations to assure all prisoners meaningful access to the courts." *Id.* at 824, 97 S.Ct. at 1496. Thus, a state "may not validly enforce a regulation ... barring" jailhouse lawyers "unless and until the State provides some reasonable alternative to assist inmates in the preparation of petitions for post-conviction relief." *Johnson v. Avery,* 393 U.S. 483, 490, 89 S.Ct. 747, 751, 21 L.Ed.2d 718 (1969). Further, prison officials must "assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Bounds,* 430 U.S. at 828, 97 S.Ct. at 1498 (footnote omitted).

In other words, the State must provide some assistance, either by making counsel available to inmates, by maintaining ade-

---

ing all incoming packages justified a blanket prohibition.

**6.** *See* Appendix 1 to DCR 220–6 at 3.

**7.** *See* Division of Correction Information Bulletin No. 1–89 (DCIB No. 1–89) at ¶ 13.

**8.** Plaintiffs cite the federal prison rule, which allows three cubic feet per cell.

**1408**

quate law libraries, or by allowing "jail-house lawyers" to perform legal assistance functions. However, the State need not in every instance provide all of these services; rather, the State's plan "must be evaluated as a whole to ascertain its compliance with constitutional standards." *Bounds,* 430 U.S. at 832, 97 S.Ct. at 1500.

In 1980, this Court reviewed the Maryland Legal Assistance Programs with respect to the State's constitutional obligation to provide legal assistance to inmates in habeas corpus and civil rights cases: " '[A] legal access program need not include any particular element ... and we encourage local experimentation. Any plan, however, must be evaluated as a whole to ascertain its compliance with constitutional standards.' " *Carter v. Kamka,* 515 F.Supp. 825, 831 (D.Md.1980), quoting *Bounds,* 430 U.S. at 832, 97 S.Ct. at 1500. At that time, this Court determined that by funding various programs for legal assistance by trained persons, Maryland's Legal Assistance Program, "taken as a whole," met the " 'adequacy' requirements" of *Bounds. Id.*

As recently as September 13, 1989, this Court dismissed a new challenge to its decree in *Carter,* stating that "the State of Maryland is performing its obligations under the Decree." *Carter v. Kamka,* Civil No. K–72–642 (D.Md. Sept. 13, 1989) (Order dismissing motion to reopen case). That determination was based upon this Court's conclusion that the legal access programs for Maryland prisoners continued to meet the *Bounds* requirements, largely by virtue of the array of services provided by the

Office of the Public Defender and the Prisoner Assistance Program of the Legal Aid Bureau.[9] Moreover, there are no statutory or regulatory bars to the function of "jail-house lawyers" in Maryland correctional facilities. Thus, plaintiffs' core complaint is that the new regulation makes inmate legal research less convenient, *i.e.,* when materials in excess of the 1.5 cubic feet limit are needed. In light of the range of assistance available to inmates seeking access to the courts, that inconvenience does not rise to the level of a constitutional violation.

■ Even if this Court did find a constitutional infringement in the 1.5 cubic feet limit upon legal materials required under DCR 220–6, this Court believes that the State's asserted justifications for the rule meet the *Turner* standards. The mere fact that other prison systems impose different limitations does not render DCR 220–6 "irrational" or "arbitrary"; nor does the regulation fail because the State's fire safety concerns could have been alleviated by the less restrictive, but far more costly, alternative of installing fire-proof cabinets in cells.[10] *Turner* explicitly does not require the use of least restrictive alternatives, especially when that alternative is an expensive one. *Id.* 482 U.S. at 90–91, 107 S.Ct. at 2262.

Finally, defendants are not required to show that DCR 220–6 was a response to specific security or safety breaches. Both *Turner* and *Bell, supra,* upheld regulations for reasons very similar to the justifications cited by defendants in this case,[11]

---

**9.** At a hearing held before this Court on November 20, 1989, plaintiffs chose not to press a claim that the State of Maryland had failed to adhere to the requirements of the *Carter* decree. Instead, plaintiffs chose to petition this Court to *expand* the *Carter* decree, *i.e.,* to require more legal services than those currently mandated by that decree. *See* November 20, 1989 hearing transcript at 73. That issue will be determined in a separate opinion which this Court will file as soon as possible in *Carter* and in this case. This Court will rule on plaintiffs' petition to expand the outstanding decree in *Carter v. Kamka* independently of the within litigation.

**10.** Defendants estimate the cost of purchasing and installing fire-proof cabinets for each state

prison cell at approximately $100 per cell, or $1,470,000 in total.

**11.** In *Turner,* the Court upheld a ban on correspondence among inmates for prison security reasons. The State asserted that such correspondence might augment problems with prisoner groups. *Turner,* 482 U.S. at 91–92, 107 S.Ct. at 2262–63. In that case, the Court also rejected Missouri's requirement that prisoners obtain official permission before marrying, on the grounds that "[c]ommon sense" dictated that there was no logical connection between the interests proffered by the State and the marriage regulation. *Id.* at 98, 107 S.Ct. at 2266.

and nothing in those opinions indicate that the Court's decisions were prompted by immediately identifiable crises; rather, the Supreme Court accepted prison officials' general, common sense concerns regarding safety and security and gave deference to their judgments as to administrative feasibility. Consequently, the State of Maryland's express interests in fire safety and prison security, manifested in DCR 220–6, are legitimate penological concerns, the validity of which are subject to judicial discretion by this Court.

Plaintiffs are left with ample opportunities for access to the courts through established legal assistance programs, some prison libraries and the monthly rotation system for in-cell legal materials authorized by DCR 220–6. In addition, there appear to be no obvious alternatives to limitations on the amount of material to be kept in cells which would not significantly drain prison financial resources. Therefore, even if the 1.5 cubic feet limit does infringe in any way upon prisoners' protected rights, this Court finds no constitutional impediment to its implementation under the *Turner* standards.

### III.

■ Plaintiffs also contend that the 1.5 cubic feet limit mandated by DCR 220–6 infringes on their religious freedom protected under the First and Fourteenth Amendments of the federal Constitution.[12] It is well established that prisoners retain their federal constitutional rights to freedom of religion, *Bell*, 441 U.S. at 545, 99 S.Ct. at 1877, and that each prisoner must be afforded "reasonable opportunities" to exercise those rights. *Cruz v. Beto*, 405 U.S. 319, 322 n. 2, 92 S.Ct. 1079, 1081 n. 2, 31 L.Ed.2d 263 (1972). However, even where religious freedoms are at issue, the Supreme Court has reiterated the theme "that prison officials must be accorded latitude in the administration of prison affairs," *id.* at 321, 92 S.Ct. at 1081, and that

even those contitutionally protected rights are subject to reasonable "restrictions and limitations." *Bell*, 441 U.S. at 545, 99 S.Ct. at 1877.

The Fourth Circuit has applied the deferential *Bell* standard to state infringement of prisoners' First Amendment rights to the free exercise of religion. In *Dettmer v. Landon*, 799 F.2d 929, 934 (4th Cir.1986), *cert. denied*, 483 U.S. 1007, 107 S.Ct. 3234, 97 L.Ed.2d 739 (1987), Judge Butzner, writing for a Fourth Circuit panel, upheld a state prison official's decision to forbid an inmate's use of salt, candles, and incense in religious ceremonies and the retention of those items in his cell because there was "no substantial evidence indicating that prison officials exaggerate[d] the difficulties in supervising individual inmates' use of contraband articles in religious rites."

In the instant case, the State of Maryland has professed legitimate interests in fire safety and prison security to justify its 1.5 cubic feet limitation on religious materials, and plaintiffs have presented no evidence that prison officials have exaggerated the risks sought to be prevented through the implementation of DCR 220–6 or that the regulation is irrational. Furthermore, the alternative of installing fireproof cabinets in each cell and periodically inspecting in-cell collections of written materials for contraband would prove quite costly to the State. *See supra* p. 1408 and n. 10. Finally, as the Fourth Circuit noted in *Dettmer*, *Bell* does not require officials to use the "least restrictive" alternative in devising prison regulations where First Amendment rights are at stake. *Id.* at 933. *See also Turner*, 482 U.S. at 90, 107 S.Ct. at 2262. Therefore, this Court concludes that the limitation on the amount of in-cell religious reading material contained in DCR–220–6 is constitutional under the *Turner* standards.

### IV.

■ Division of Correction's Information Bulletin No. 1–89 (DCIB No. 1–89), issued

---

**12.** That argument is supported by affidavits from inmates which generally allege, using the same language, "I also have religious materials which if included in the 1.5 cubic feet will subject my rights to practice and study my reli-

gion to be hampered; all of my religious materials are required for me to remain faithful to my religious doctrine." Affidavits of Tyrone Jenkins, ¶ 7; Anthony Pringle, ¶ 6; Calvin Robinson, ¶ 6.

on July 15, 1989, sets forth procedures for the implementation of DCR 220–6, including the hearing process to be followed when an inmate objects to a finding that an item in his cell must be removed pursuant to the new regulation.[13]

That procedure requires that such disputes be brought before a special property arbitrator within two working days of the inventory of a cell and prior to confiscation of the items at issue. Arbitrators are to be chosen from the facilities' correctional supervisors and specially trained to conduct hearings and make property disposition decisions. Arbitrators' decisions are binding and may be appealed to the Inmate Grievance Commission (IGC) within 30 days of the arbitrators' determination. While awaiting the IGC's consideration of inmate appeals of the arbitrators' decisions, no property identified as nonallowable or excessive under this procedure will be destroyed.

While defendants agree that inmates' property will not be destroyed during the IGC appeal process pending a ruling on appeal, defendants contend that DCIB 1–89 does not foreclose the Division of Correction from requiring that the excess property be picked up or mailed to a family member or a friend who is a regular visitor to the inmate. Consequently, defendants insist that maintenance of status quo with respect to inmates' property during the IGC appeal refers only to the prohibition of destruction of property, but does not prohibit the State from requiring inmates to transfer the property to someone outside the institution during the interim. Defendants contend that such an interpretation is made necessary by the fact that the IGC process takes up to a year to complete. In contrast, plaintiffs interpret DCIB No. 1–89 as requiring the storage of property at the correctional facility until the IGC rules on the inmate's appeal. All parties concede that after the IGC has rejected the inmate's appeal, the State is no longer required to store the confiscated property,

even if further appeals of the IGC ruling are forthcoming.

Plaintiffs are foreclosed from seeking injunctive relief against defendants in federal court on the basis of defendants' interpretation and application of a state prison regulation unless such relief can be sustained on federal constitutional or federal statutory grounds. *See Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 124–25, 104 S.Ct. 900, 921, 79 L.Ed.2d 67 (1984). In various motions before this Court, plaintiffs have challenged the hearing process set forth in DCIB No. 1–89 as being constitutionally flawed. However, the precise contours of their objections are unclear. In their opposition to defendants' Motion for Summary Judgment, plaintiffs characterize the hearing procedure as "a sham and a denial of due process." As the hearing process can result in the deprivation of inmates' property, plaintiffs could argue that the regulation deprives them of a constitutionally protected property interest without due process of law, in violation of the Fourteenth Amendment of the Constitution.

In *Parratt v. Taylor*, 451 U.S. 527, 536–37, 101 S.Ct. 1908, 1913, 68 L.Ed.2d 420 (1981), the Supreme Court held that a prisoner's mail order hobby kit "falls within the definition of property," and that its loss through the negligence of a prison official amounted to a "deprivation" for purposes of due process analysis. Later, in *Hudson v. Palmer*, 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984), the Court indicated that an intentional deprivation of a prisoner's personal property during a routine shakedown implicated procedural due process concerns. The Supreme Court concluded, however, that the deprivations of property which occurred in both *Parratt* and *Hudson* did not violate the Due Process Clause since, in both instances, the State had provided "adequate post-deprivation remed[ies]" for the alleged destruction of property." *Hudson*, 468 U.S. at 536, 104 S.Ct. at 3205. Nevertheless, the Court distinguished *Parratt* in *Logan v. Zimmer-*

---

**13.** DCIB No. 1–89 specifically states that the procedures set forth therein are to be followed only during the implementation period of DCR

220–6. Once DCR 220–6 is fully implemented, property classification procedures will be governed by applicable DCRs.

*man Brush Co.,* 455 U.S. 422, 435–36, 102 S.Ct. 1148, 1157–58, 71 L.Ed.2d 265 (1982), where it held, in an employment discrimination context, that a post-deprivation hearing does not satisfy due process where a deprivation of property is caused by conduct pursuant to established state policy or procedure, rather than random and unauthorized action. While the deprivations which plaintiffs in the instant case might experience upon implementation of DCR 220–6 would occur pursuant to established state procedures, *i.e.,* DCIB No. 1–89, it remains unclear whether *Logan's* requirement of a predeprivation hearing necessarily extends to the more restrictive prison context.[14] More significant to the instant case, however, is the fact that DCR 220–6 and DCIB No. 1–89 already provide for a pre-deprivation hearing before a special property arbitrator within two days of an inventory of a cell and prior to the confiscation of any property.

The fact that DCR 220–6 and DCIB No. 1–89 require correction supervisors to serve as special property arbitrators does not, in and of itself, present "such a hazard of arbitrary decisionmaking that it should be held violative of due process of law." *Wolff v. McDonnell,* 418 U.S. 539, 571, 94 S.Ct. 2963, 2982, 41 L.Ed.2d 935 (1974). In *Wolff,* the Supreme Court noted that a procedure for determining whether prisoners' good time credits should be revoked must observe certain minimal due process requirements, consonant with the unique institutional environment of a prison, which reasonably accommodates the interests of inmates and the needs of the correctional facility. *Id.* 418 U.S. at 560–63, 94 S.Ct. at 2976–78. The Court held that in such prison disciplinary proceedings, due process requires that there be a written statement by the factfinders as to the evidence relied on and the reasons for any disciplinary action, and that the inmate should be allowed to call witnesses and present documentary evidence when permitting him to do so will not be unduly hazardous to institutional, safety or correctional goals; however, due

process does not always require confrontation or cross-examination procedures, nor does it require that the inmates always have a right to counsel. *Id.* at 563–70, 94 S.Ct. at 2978–82.

■ The *Wolff* procedural standard may be applicable in other proceedings involving other constitutionally protected prisoner rights, including such important interests as parole eligibility determinations, *see Greenholtz v. Inmates of Nebraska Penal & Correctional Complex,* 442 U.S. 1, 14, 99 S.Ct. 2100, 2107, 60 L.Ed.2d 668 (1978), and, by the Fourth Circuit, in connection with prisoner transfers where a liberty interest is involved. *Hayes v. Thompson,* 726 F.2d 1015, 1017 (4th Cir.1984). Moreover, the DCIB 1–89 hearing procedure established for the implementation of DCR 220–6 accords with the due process requirements set forth in *Wolff.* This Court will not require greater procedural protections in the instant case where the interest at issue—possession of individual items of property—is less compelling than the liberty interests at stake in *Wolff* or its progeny. Plaintiffs have cited no authority, nor is this Court aware of any, which suggests that the post-hearing appeal to the IGC is constitutionally mandated, or that the State may not require the removal of confiscated property from the correctional facility, prior to the completion of the IGC appeal, once the arbitrator determines that the property is excessive or not allowable under DCR 220–6. As such, plaintiffs are unable to show that defendants' proposed application of DCR 220–6 and DCIB No. 1–89 permitting the removal of confiscated property during inmates' appeal to the IGC violates either the federal Constitution or a federal statute. Plaintiffs may seek state court review of defendants' interpretation and proposed application of state correctional regulations solely on state law grounds; however, this Court lacks jurisdiction and is barred by the Eleventh Amendment from enjoining state officials unless such a remedy can be sustained on

---

**14.** In *Hudson,* 468 U.S. at 534, 104 S.Ct. at 3204, the Supreme Court distinguished the facts in that case from those at issue in *Logan;* however,

the Court made no suggestion that the requirements of *Logan* would not be applicable in the prison context.

federal grounds. *See Pennhurst*, 465 U.S. at 124–25, 104 S.Ct. at 921. The fact that plaintiffs' state law claim is pendent to other viable federal claims is of no consequence since "neither pendent jurisdiction nor any other basis of jurisdiction may override the Eleventh Amendment." *Id.* at 121, 104 S.Ct. at 919 (footnote omitted).

## V.

Plaintiffs' fourth objection to DCR 220–6 concerns the regulation's procedures for handling confiscated property and the requirement that inmates incur the cost of mailing excess property to a custodian outside the prison. The rule calls for officials to confiscate any property not included in the allowable property inventories listed in DCR 220–6 and DCR 220–8 and determined by the hearing officer to be excessive. Prisoners are then left with three options: to arrange for family or friends to remove the property from the prison; to have the items mailed out of the facility at the inmate's expense; or to allow prison officials to dispose of the property if no other provisions have been made for its removal. With regard to that final category, *i.e.*, confiscated property which prisoners are unable to have picked up or mailed out, prison officials will make a reasonable attempt to appraise it. If the property is not of sufficient value to make it cost-effective to sell it either individually or in bulk with other confiscated property, then that property will be disposed of as the State sees fit. However, where the confiscated property is of sufficient value to warrant its sale, the State may place the proceeds of the sale, less expenses incurred in appraisal and sale of that property, in an Inmate Welfare Fund.[15] While plaintiffs do not challenge defendants' authority to regulate the amount of property allowed in a prisoner's cell or to change those regulations for a valid reason except as noted *supra*, they argue that inmates, as individuals, are le-

gally entitled to the net proceeds from the sale of their property confiscated pursuant to the regulation. Furthermore, plaintiffs argue that defendants are legally obligated to pay for the cost of mailing excess property to the inmate's designated custodian.

In support of their argument concerning the use of net proceeds, plaintiffs invoke the Takings Clause of the Fifth Amendment and precedent established in federal and state law to the effect that a provision "that purports to require a property owner to spend money on his property for the public benefit will transgress" federal and state constitutional provisions. *Arnold v. Prince George's County*, 270 Md. 285, 294, 311 A.2d 223 (1973). Plaintiffs argue that DCR 220–6 contravenes one of the necessary elements which the State must show in order to avoid effecting a taking in this instance, namely, that the regulation not deny an owner "economically viable use" of his property. *Agins v. Tiburon*, 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980).

Plaintiffs' requests for compensation for the sale proceeds of confiscated property and for reimbursement of mailing costs cannot prevail as a matter of law. In *Hanvey v. Blankenship*, 631 F.2d 296, 297 (4th Cir.1980), the Fourth Circuit upheld the confiscation of currency in an inmate's possession in excess of amounts permitted by prison regulation, and agreed with the district court that compensation was not required. Indeed, when analyzing confiscation of inmate property for violations of prison regulations, courts have uniformly joined with the Fourth Circuit in concluding that this type of deprivation of property is not a "taking" under the Fifth Amendment, but rather more closely related to a statutory forfeiture. *See, e.g., Sell v. Parratt*, 548 F.2d 753, 758 (8th Cir.), *cert. denied*, 434 U.S. 873, 98 S.Ct. 220, 54 L.Ed.2d 152 (1977).[16] In so doing, the

---

**15.** *See* DCR 220–5 § VI.D.2.d.

**16.** Plaintiffs contend that since the property at issue is neither the fruit or instrumentality of a crime, nor inherently illegal, defendants cannot justify the taking as a statutory forfeiture. Plaintiffs further assert that the State's decision

to impose new restrictions with respect to allowable property via DCR 220–6 cannot be construed as a forfeiture pursuant to Md.Ann.Code, art. 27, § 678A, because redefinitions of what property is subject to seizure must be applied prospectively, citing *Montgomery County v. A*

courts have abided by long-standing precedent. In a 1919 decision involving the deprivation of income from warehoused liquor under the Prohibition Act, *Hamilton v. Kentucky Distilleries & Warehouse Co.*, 251 U.S. 146, 40 S.Ct. 106, 64 L.Ed. 194 (1919), the Supreme Court distinguished between constitutionally protected takings, in which the government appropriates private property for public use, and restrictions or deprivations of property accomplished as an exercise of state police power. The latter, the Court stated, were mere forfeitures which required no compensation. *Id.* at 156–57, 40 S.Ct. at 108. That doctrine was later well summarized in an opinion discussing federal statutory forfeiture of automobiles used to transport illegal narcotics:

> Where Congress, in the implementation of its constitutional powers, provides for penalties such as forfeitures, such action is not a taking of property in the constitutional sense. It is not an instance of eminent domain, in which property is taken because the *use of such property* is beneficial to the public. Rather, the property interest is infringed because Congress has deemed it necessary in order to preserve other incidents of the public welfare. As such, it represents a federal exercise of a police power to which the constitutional requirement of compensation is inapplicable.

*United States v. One 1962 Ford Thunderbird*, 232 F.Supp. 1019, 1022 (N.D.Ill.1964) (emphasis in original).

That view reflects settled law. 37 C.J.S. Forfeiture § 2 at 3 (1943), defines forfeiture as the "divestiture of specific property without compensation resulting from failure to comply with the law," and notes that

> statutes providing for specific forfeitures for specific acts have usually been deemed constitutional as against the objection of their being in deprivation of

property for public use without compensation, or without due process of law, when such forfeiture fairly tends and is reasonably necessary to accomplish a legitimate purpose under the police power.

*Id.*, § 4 at 8 (citations and footnotes omitted).

According to this analytic framework, the confiscation of excess property under DCR 220–6 falls under the rules of forfeiture and is not, as plaintiffs suggest, a taking. Under the regulation, the State may confiscate property not for the beneficial use of the public, but rather as a quintessential police power function: the orderly and secure operation of the State's prisons.

That does not mean, of course, that the State can deprive inmates of their property indiscriminately. It is black letter law that "forfeitures are not favored," and, therefore, that "they will not be given effect to, except by the express terms of a statute or by necessary implication flowing from some express provision of the statute, and where the facts which purport to require such action come clearly and plainly within the provisions of the law." *Id.*, § 5 at 10 (footnotes omitted).

In one of a series of cases involving the confiscation of currency in the possession of inmates in excess of dollar limits imposed by regulation or statute, a federal court has stated that "no one questions the right of a state to forbid its convicts to have money in their possession while undergoing confinement and may take away from them money that is found in their possession." *Sell*, 548 F.2d at 756. However, the courts have been careful to ascertain that the forfeiture is based on an express statutory provision. *Id.* at 758. In *Sell*, the Eighth Circuit held that a state's penal system cannot permanently deprive an inmate of money found in his possession "unless the power to effect such a forfei-

---

*Sum of $103,428.23*, 264 Md. 208, 285 A.2d 663 (1972). *Sell*, and cases cited *infra*, belie plaintiffs' contention that only fruits or instrumentalities of crime, or inherently illegal property, are subject to statutory forfeiture. Similarly, with respect to plaintiffs' argument that DCR 220–6 cannot redefine what property is subject to stat-

utory forfeiture retrospectively, *Sell* merely states that cash property seized pursuant to an arrest cannot be forfeited retroactively where the statute authorizing forfeiture of cash property was passed subsequent to the arrest and seizure.

ture is expressly, or at least by fair implication, conferred by the statutes of the state." *Id.* The Fourth Circuit in *Hanvey* upheld the district court's conclusion that "for permanent forfeiture of an inmate's money not to violate the Fourteenth Amendment, there must be underlying statutory authority prescribing to the prison officials such a right." *Hanvey v. Blankenship*, 474 F.Supp. 1349, 1350 (W.D. Va.1979), *aff'd*, 631 F.2d 296 (4th Cir.1980), citing *Sell*, 548 F.2d at 759. Similarly, the Eleventh Circuit has upheld the confiscation of cash in excess of the $30 limit on the amount which inmates are allowed to possess according to Florida prison regulations, when Florida statute authorized state prison officials to confiscate and liquidate contraband found in the possession of prisoners. *Baker v. Piggott*, 833 F.2d 1539, 1540 (11th Cir.1987), *cert. denied*, 487 U.S. 1241, 108 S.Ct. 2918, 101 L.Ed.2d 949 (1988).

Defendants point to two provisions of the Maryland Criminal Code as the statutory basis for the confiscation provisions contained in DCR 220–6. Article 27, § 676 of the Md.Ann.Code authorizes prison officials to "adopt and promulgate reasonable rules and regulations for the operations and maintenance of the several institutions and agencies in the Division [of Correction]. These rules and regulations shall provide for the discipline and conduct of inmates … and may be altered, amended or abrogated by the Commissioner." That provision grants prison officials clear authority to promulgate—and to modify—rules concerning personal property held by inmates.

Moreover, section 678A(c)(2) of the Code spells out procedures for the handling of confiscated property. It states that prisoners have the right to have confiscated property "removed from the institution or sent to a person outside the institution at the inmate's expense"; the provision further authorizes prison officials to dispose of items not removed or sent out by the inmate within 30 days of the inmate's receipt of notice of confiscation.[17]

Those provisions of Maryland's criminal code constitute the clear and specific underlying statutory authority required by the Fourth Circuit for the disposition of confiscated prisoner property. Even if the statutory provisions are construed most strictly, DCR 220–6 falls well within the statute's grant of authority. As such, implementation of the regulation's measures for post-confiscation disposition of excess inmate property does not violate the federal Constitution. Consequently, since section 678A(d) states that "[a]ll claims to abandoned [*e.g.*, confiscated] property are absolutely barred," plaintiffs' claim that they are constitutionally entitled to the proceeds from the sale of property confiscated pursuant to DCR 220–6 is unpersuasive.

■ The requirement that inmates mail confiscated property to a person outside the institution at the inmate's own expense is likewise not violative of the Takings Clause. Inmates are offered three alternatives with respect to property confiscated pursuant to DCR 220–6. The regulation does not force inmates to mail the confiscated property to persons outside the institution and thereby incur postage fees. Clearly, the effect of the regulation is to allow inmates an opportunity to salvage property which would otherwise become subject to forfeiture and disposition by the State. That plaintiffs regard the disposi-

---

**17.** The relevant provisions of § 678A are as follows:

(c)(1) The Commissioner shall adopt rules and regulations defining that property which is contraband in the institutions of the Division of Correction and prescribing procedures for the confiscation of contraband by institutional staff.

(2) Any inmate whose property is confiscated shall be notified that he has a right to have the property removed from the institution or sent to a person outside the institution at the inmate's expense. If the inmate fails to have the proper-

ty removed within 30 days after notice of confiscation, the property will be treated as abandoned property in accordance with the provisions of subsection (d) of this section.

(d) Personal property unclaimed within the period of time referred to in subsection (a) shall be deemed abandoned. Abandoned property may be converted to the use of the Division of Correction, sold, or otherwise disposed of according to procedures established by the Commissioner of Correction. All claims to abandoned property are absolutely barred.

tion of confiscated property under DCR 220–6 as being inequitable is understandable; however, that perceived unfairness does not thereby render the policy constitutionally infirm.

## VI.

■ Plaintiffs assert that DCR 220–6's prohibition of in-cell electric hot pots constitutes cruel and unusual punishment and violates the Eighth Amendment and also offends *Turner* which requires that a prison regulation bear a reasonable relationship to a legitimate penological interest.

The Supreme Court has recognized that the Eighth Amendment reaches beyond physically "barbarous" punishments. *Rhodes v. Chapman,* 452 U.S. 337, 346, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981). When prison conditions result in "unquestioned and serious deprivation of basic human needs," they violate the Eighth Amendment. *Id.* at 347, 101 S.Ct. at 2399. For Eighth Amendment purposes, prison conditions are to be judged according to a "contemporary standard of decency." *Id.*

Under the *Rhodes* principles, the regulation banning hot pots cannot be said to violate the Eighth Amendment. While the Constitution bars conditions that do not conform to basic standards of human decency, the Supreme Court has observed that, short of that standard, "[t]o the extent that ... conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society." *Id.*

Plaintiffs have not alleged that prison food services are inadequate, much less demonstrated that the food service is substandard to the point where prisoners must provide for their own nourishment. It is obviously more convenient for inmates to keep electric heating devices in their cells; convenience, however, is not the standard by which alleged Eighth Amendment violations are to be judged.

Nor does the prohibition of in-cell hot pots violate any standard set forth in *Turner.* For the *Turner* standards to be implicated, a prison regulation must first impinge on an inmate's protected rights. *Turner,* 482 U.S. at 89, 107 S.Ct. at 2261. Prison inmates have no constitutional right to a hot pot in their cells. It is also significant that the State asserts a valid and important interest in fire safety to support the restriction on hot pots; many facilities, including college dormitories and offices, ban electric heating devices for precisely that reason. Furthermore, since all State correctional facilities provide food service to inmates, and those services are not alleged to be inadequate, alternative means for obtaining sustenance remain open to inmates despite the prohibition on hot pots. As such, the regulation violates neither the Eighth Amendment of the Constitution nor any *Turner* standard.

## VII.

There are no disputed material and relevant facts in this case. Nor, in the context of the factual background of this case, does DCR 220–6 offend, as a matter of law, any federal constitutional or other federal rights of plaintiffs. Accordingly, summary judgment will be granted in favor of defendants who may now implement DCR 220–6 throughout the Maryland correctional system.

1416

APPENDIX 1

| DIVISION OF CORRECTION REGULATION STATE OF MARYLAND<br><br>DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONAL SERVICES | DCR NO. ___220-6_____<br>DATE_____August 29, 1988_____<br>SUBJECT: INMATE PROPERTY & CLOTHING<br><br>TITLE: Allowable Inmate Property |
|---|---|

**I. References:** DCRs 220-1, 220-4, 220-5, 220-8 and 220-9

**II. Applicable to:** All Institutions

**III. Purpose:** To provide policy and guidance concerning items which an inmate may have in an inmate's possession.

**IV. Definitions:** MCAC - Maryland Correctional Adjustment Center

**V. Policy:**

It is the policy of the Division of Correction to allow personal property of types and in amounts reasonably necessary for the comfort and convenience of inmates, while ensuring that institutional order and security are not compromised. Every effort is made to ensure that Division of Correction policy regarding personal property authorized to be in an inmate's possession is as consistent as possible throughout Division of Correction institutions.

**VI. Procedures:**

A. In order to control the amount of property that an inmate may have in his/her possession and to facilitate the transfer process, the Commissioner shall authorize a standard list of allowable inmate property to govern all institutions with the exception of MRDCC, MCPRS, MCI-W and MCAC, where the respective warden shall establish a standard list governing his/her institution which conforms with applicable sections of this DCR.

B. Within 6 months of the effective date of this DCR all inmates must have only the authorized personal property items listed in Appendix 1 or specified by institutional directive, as applicable. The exception to this shall be that an inmate may retain a television. radio/cassette or typewriter which does not meet the specifications of the DCR, until such time as the inmate is transferred to another institution.

C. The institution shall not be responsible for any item which is stolen or damaged, unless it can be proven that the loss or damage was the result of malice or negligence by an employee.

D. All Institutions except MRDCC, MCPRS, MCI-W and MCAC

1. The list of permissible items that an inmate may have in his/her possession during confinement in the Division of Correction is contained in Appendix 1. This list shall be reviewed annually by the assistant managing officers who shall recommend changes to the Commissioner as necessary.

2. In the review of this list, the assistant managing officers shall ensure that the personal property list is both comprehensive and standardized.

**E. MRDCC**

The warden of MRDCC shall establish, by institutional directive, a list of property items that inmates assigned to that institution may retain in their possession. Since this institution houses a transient population, the allowable property list established by the warden shall be less extensive than that authorized in Appendix 1 of this DCR.

**F. MCPRS**

The warden of the MCPRS shall establish, by institutional directive, a list of allowable property items that an inmate may retain in his/her possession. That list shall approximate, as much as possible the list contained in Appendix 1 of this DCR.

**G. MCI-W**

1. The warden of MCI-W shall establish, by institutional directive, a list of property items that an inmate of that institution may retain in her possession. That list shall approximate, as much as possible the list contained in Appendix 1 of this DCR.

2. An inmate transferred from the Pre-Release Unit for Women to MCI-W shall be transferred with only those items contained in MCI-W's authorized list of allowable property. The warden of MCI-W shall ensure that a copy of the MCI-W allowable property list and any changes are forwarded to the Pre-Release Unit for Women.

**H. MCAC**

The warden of MP shall establish an institutional directive prior to the opening of MCAC, listing property that an inmate assigned to MCAC may retain in his possession. Due to the mission of MCAC and the nature of its population, the property list for this institution will be less extensive than that authorized in Appendix 1 of this DCR.

**I. Transfers Between Institutions (Except MCI-W)**

An inmate transferred from one institution to another shall transferred with only those items indicated in Appendix 1.

1. This shall include an inmate transferred from the MCPRS to an institution of greater security.

2. The exception shall be an inmate transferred to the MCPRS to include Brockbridge Correctional Facility, who shall be transferred with only the property contained in the MCPRS authorized list of allowable property. The warden of MCPRS shall ensure that a copy of the MCPRS allowable property list and any changes are forwarded to the other wardens.

**J.** As noted in Appendix 1, in those institutions where inmate uniforms are used, certain personal clothing items are not permitted.

**K.** The warden may authorize the removal of any inmate personal property item which presents a security, health, sanitation or fire safety hazard.

**L.** Each warden shall develop institutional directives that implement and comply with this DCR. In addition to operationalizing the above sections of this DCR, the directives will:

1. Ensure that an inmate is permitted to have his/her possession only those items included on the authorized list governing that institution. All other items shall be considered contraband and disposed of in accordance with DCR 220-5;

2. Ensure that an inmate not receive through the mail or visitation an item which is on the institution's commissary list, except as authorized during special package periods or when the warden makes an individual exception based on documented reasons;

3. Allow, at the warden's discretion, that an allowable item not available in the commissary be ordered through commissary catalogs, where available, or received in packages, in accordance with DCR 220-9;

4. Ensure that there are clear and exact procedures for the receipt, handling and distribution of these packages;

5. Ensure that inventory and control of inmate property be maintained, using the Personal Property Inventory (DC Form 220-8a) and procedures in DCR 220-8.

6. Eliminate the amount of excess property accumulated by an inmates by means of cell searches which include inventory of property items, and confiscation of contraband items in accordance with DCR 220-5;

7. Ensure that a current and accurately described inventory of inmate property be maintained, using the Personal Property Inventory (DC Form 220-8a); and,

8. Ensure that information pertaining to allowable inmate property and the manner in which it may be received, be made available to the inmate population.

**VII.** Attachments: A. Appendix 1, Inmate's Allowable Property List
B. Appendix 2, Management Audit Form

**VIII.** Rescission: DCR 220-6, dated June 15, 1980

Arnold J. Hopkins
Commissioner

Distribution
A
C (without Appendix 2)
D " " "
L " " "

