Lynn **RUDOLPH**, Joey Abney, Theodore Toler, Charles H. Hamilton, Kenneth Iniss, Gary Vann, Jeffrey Davis, Robert S. Shaheer, Ronald Gantt, George Lewis, and LeRoy Williams on behalf of Themselves and a Class Consisting of All Similarly Situated Individuals, Plaintiffs,

v.

Mario **CUOMO**, Governor of New York State, Patrick J. Bulgaro, Director of the New York State Division of the Budget, Thomas A. Coughlin III, Commissioner of New York State Department of Correctional Services, Christopher Artuz, Acting Superintendent of Green Haven Correctional Facility, Cyril Coefield, Acting Deputy Superintendent of Security of Green Haven Correctional Facility, Defendants.

Thomas **BERRY**, Stanley Punter, and John Lopez, Plaintiffs,

v.

Mario **CUOMO**, Governor of New York State, Robert Abrams, Attorney General of New York State, Thomas A. Coughlin III, Commissioner of New York State Department of Correctional Services, Charles J. Scully, Superintendent of Green Haven Correctional Facility, and Wallace Oldham, Deputy Superintendent of Green Haven Correctional Facility, Defendants.

Nos. 92 Civ. 3402, 92 Civ. 4735, 92 Civ. 4737, 92 Civ. 5335, 93 Civ. 1414 and 92 Civ. 7365 (SWK) (THK).

United States District Court, S.D. New York.

Feb. 21, 1996.

Debevoise & Plimpton by Rodney W. Ott, New York City, for Plaintiffs.

Dennis C. Vacco, Attorney General of the State of New York by Barbara K. Hathaway, New York City, for Defendants.

KRAM, District Judge.

In these consolidated civil rights actions brought pursuant to 42 U.S.C. § 1983, plaintiffs, a class of inmates including all inmates incarcerated at New York State's Green Haven Correctional Facility ("Green Haven") from January 1, 1992 to the present, who were or are now subject to either of the two policies at issue in this case, challenge as unconstitutional two changes in the regulations of the New York Department of Correctional Services ("DOCS"): (1) a one-time, three-week pay lag of inmate wages; and (2) a mandatory five dollar disciplinary surcharge imposed when an inmate is found guilty of certain violations of prison misbehavior rules. On May 23, 1995, Magistrate Judge Theodore H. Katz issued a Report and

Recommendation (the "Report") recommending that defendants' motion for summary judgment dismissing all of plaintiffs' claims be granted. Plaintiffs now seek an order rejecting the Report. For the reasons set forth below, plaintiffs' motion is denied and the Report is adopted in full.

## BACKGROUND [1]

### I. The Pay Lag Policy

Green Haven is a correctional facility located in Stormville, New York housing state prisoners. According to prison regulations, all able-bodied Green Haven inmates must perform work assignments during their period of incarceration. *See* Green Haven Inmate Orientation Handbook ("Green Haven Handbook"), annexed to the Affidavit of Rodney W. Ott, dated Feb. 28, 1994 (the "Ott Aff."), as Exh. "11," at 41–42. While inmates may request a particular work assignment, prison officials do not guarantee that such requests will be granted in all instances. *Id.* The rate of pay ranges from sixty cents to two dollars per day, depending on the nature of the work.[2] *See* Complaint at ¶ 49; Answer at ¶ 17.

Earnings accumulated in this way are not given directly to inmates, but rather are placed in a special account. Inmates are allowed to deduct earnings from their accounts by sending money home to family members, ordering from approved catalogs or making purchases at the facility commissary. *See* Defs.' Interrog.Resp. at No. 5. When inmates make a monetary transaction, they fill out a "withdrawal slip" and DOCS debits their accounts accordingly. Under this system, inmates never actually receive or handle cash payments for their work. *See* Deposition of Russell DiBello, taken on July 19, 1993, annexed to the Ott Aff. as Exh. "4" ("DiBello Dep."), at 111–13.

On January 9, 1992, DOCS implemented a new policy whereby state prison inmates'

---

**1.** The following statement of facts is taken from the parties' pleadings and Rule 3(g) Statements, unless otherwise indicated. For the purposes of this Memorandum Opinion and Order, only the facts bearing upon plaintiffs' objections will be summarized herein.

**2.** DOCS has compensated inmates for work performed while incarcerated since prior to the turn of the century. *See* Defendants' Answers to Interrogatories, dated Oct. 12, 1993, annexed to Ott Aff. as Ex. "2" ("Defs.' Interrog. Resp."), at No. 1. Inmates have been paid bi-weekly since some time before 1981. Defs.' Interrog. Resp. at No. 2.

compensation for work performed while incarcerated was reduced by twenty percent over a period of fifteen weeks (the "Pay Lag Policy"). In other words, DOCS withheld the equivalent of three weeks pay from each inmate. The Pay Lag Policy provided that inmates would be entitled to receive the withheld funds, known as "lagged payroll," upon release from the prison system, a period of time which varies from inmate to inmate.

## II. The Disciplinary Surcharge Policy

Under state law, DOCS' employees are authorized to issue a misbehavior report ("MR") to any inmate who violates prison rules. *See* N.Y.Comp.Codes R. & Regs. tit. 7, § 270.2. After an MR is entered, the charge is reviewed by an area supervisor and then forwarded to a reviewing officer. *See* Deposition of Cyril Coefield, taken on Nov. 3, 1993, annexed to the Ott Aff. as Exh. "10" (the "Coefield Dep."), at 18–19. The reviewing officer either dismisses the charge or designates it as a Tier I, Tier II or Tier III violation, depending on several factors, including the frequency of the inmate's violations and the severity of the conduct. *See* Green Haven Handbook at 14. Because many of the violations allow for hearings in a range of tiers, *see* N.Y.Comp.Codes R. & Regs. tit. 7, § 270.2, similar MRs are often designated to different tiers, *see* N.Y.Comp. Codes R. & Regs. tit. 7, §§ 270.1 and 270.2.

After a violation has been assigned to a certain tier, the reviewing officer refers the MR to a hearing officer and a hearing is conducted. The level of due process accorded an inmate at the hearing corresponds to the tier to which the infraction has been assigned. *See* N.Y.Comp.Codes R. & Regs. tit. 7, § 270. Tier I violations, representing the least severe infractions, are subject to a violation hearing and are adjudicated by a prison sergeant. Tier II violations give rise to a disciplinary hearing and are adjudicated by a lieutenant. Tier III violations, the most severe penalty level, are adjudicated at a superintendent's hearing, presided over by a captain or other high level employee such as a deputy superintendent, senior counselor, steward or education director. *See* Coefield Dep. at 20–22. In no circumstance may a charging, investigating or reviewing officer serve in an adjudicative role at the hearing. Inmates found guilty of Tier II or Tier III offenses are entitled to an administrative appeal and subsequent judicial review in a state court Article 78 proceeding. *See* N.Y.Comp. Codes R. & Regs. tit. 7, §§ 253.8 and 254.8; N.Y.Civ.Prac.L. & R. §§ 7801, *et seq.*

On December 18, 1991, the New York State Commissioner of Correctional Services issued a new order, effective January 1, 1992, requiring inmates convicted of misbehavior in a Tier II or Tier III disciplinary hearing to pay a five dollar mandatory disciplinary surcharge (the "Disciplinary Surcharge" or "Disciplinary Surcharge Policy"). *See* N.Y.Comp.Codes R. & Regs. tit. 7, §§ 253.7 and 254.7. Monies collected from the Disciplinary Surcharge are deposited in the state general fund and are not allocated specifically to the DOCS budget. *See* Affidavit of Donald Selsky, dated Apr. 28, 1994, at ¶ 5.

## III. The Present Proceedings

On May 11, 1992, plaintiffs brought suit challenging the Pay Lag and Disciplinary Surcharge Policies. In their complaint, plaintiffs claim that the Pay Lag Policy is unconstitutional in that it (1) deprives them of property without due process of law because they possess a property right in the timely payment of their compensation; (2) violates the Takings Clause of the Fifth Amendment; and (3) impairs their rights under the Constitution's Contracts Clause.

With respect to the Disciplinary Surcharge Policy, plaintiffs claim several constitutional violations: (1) violation of inmates' rights to procedural due process based on the introduction of bias into the disciplinary system; (2) infringement of inmates' substantive due process rights when state officials allow forfeitures and confiscations of property without explicit statutory authorization; and (3) violation of the Equal Protection Clause on the ground that the Disciplinary Surcharge does not expressly provide for a waiver in cases of indigence or unreasonable hardship, despite the fact that other mandatory surcharges do provide such a possibility.

On May 23, 1995, Magistrate Judge Katz issued his Report recommending that the

Court grant defendants' motion for summary judgment dismissing the complaint. First, the Magistrate Judge held that the Pay Lag Policy does not violate any of the asserted constitutional protections. The Magistrate Judge found that while inmates have a property interest in wages they have earned, Report at 9–11, they have no such property interest in the timely payment of these wages, *id.* at 12–15. With respect to the Takings Clause claim, the Magistrate Judge found that since plaintiffs lack a vested property right in the prompt payment of inmate wages, there could be no compensable taking, and, furthermore, plaintiffs lack a reasonable investment-backed expectation in such prompt payment. *Id.* at 16–18. Finally, the Magistrate Judge determined that the Pay Lag Policy does not impair their contract rights under the Contracts Clause because there is no contract between plaintiffs and the state, and that even if such a contract exists, it does not provide for the timely payment of wages.

Second, the Magistrate Judge dismissed plaintiffs arguments with respect to the Disciplinary Surcharge Policy. Magistrate Judge Katz found that any interest on the part of adjudicating officers is far too remote to give rise to an inference of bias. *Id.* at 26–35. The Report also concludes that the Disciplinary Surcharge Policy does not involve a forfeiture without due process of law, and that even if such actions constitute a forfeiture, there is adequate statutory authority for the Disciplinary Surcharge Policy. *Id.* at 35–39. Finally, the Magistrate Judge found that the lack of an indigency waiver in the Disciplinary Surcharge Policy does not violate the Equal Protection Clause because plaintiffs were not similarly situated to those unincarcerated individuals who may obtain indigency waivers for other surcharges. *Id.* at 40–41. Furthermore, the Magistrate Judge found that the Disciplinary Surcharge is rationally related to a legitimate penological interest, and thus does not run afoul of equal protection guarantees. *Id.* at 42–44.

On July 7, 1995, plaintiffs filed objections to the Report, arguing that the Magistrate Judge reached incorrect conclusions of law and fact on nearly every issue. With respect to the Pay Lag Policy, plaintiffs argue that the Magistrate Judge erred by: (1) resolving disputed factual issues relating to the significant hardship that the Pay Lag Policy imposes on inmates; (2) holding that DOCS could withhold inmate wages for years without violating the Due Process Clause; (3) finding that no taking occurred within the meaning of the Takings Clause even though inmates are not compensated in any way for their withheld wages; and (4) holding that DOCS' unilateral alteration of the terms of inmate employment is permissible under the Contracts Clause.

As for the Magistrate Judge's findings vis-a-vis the Disciplinary Surcharge Policy, plaintiffs contend that he erred by: (1) resolving disputed factual issues relating to the significant discretion DOCS gives its employees in the operation of the DOCS disciplinary system; (2) holding that DOCS properly clarified the purpose of the Disciplinary Surcharge; (3) finding that DOCS' employment of improper incentives in the disciplinary process does not violate the Due Process Clause; (4) determining that the confiscation of inmate funds without express statutory authorization does not violate the Due Process Clause; and (5) holding that DOCS can deny inmates indigency waivers of the Disciplinary Surcharge without violating the Equal Protection Clause. The Court shall address these objections below.

## DISCUSSION

### I.  Standard of Law

Rule 72(b) of the Federal Rules of Civil Procedure governs determinations by magistrate judges with respect to dispositive motions. *See* Fed.R.Civ.P. 72(b). Specifically, Rule 72(b) provides that, where a magistrate judge issues a Report and Recommendation that is dispositive of a claim or defense, the court must review *de novo* those portions to which the parties object.

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any

material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party must initially satisfy a burden of demonstrating the absence of a genuine issue of material fact, which can be done merely by pointing out that there is an absence of evidence in support of the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–25, 106 S.Ct. 2548, 2552–54, 91 L.Ed.2d 265 (1986). The nonmoving party then must meet a burden of coming forward with "specific facts showing that there is a genuine issue for trial," Fed.R.Civ.P. 56(e), by "a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. at 322, 106 S.Ct. at 2552.

The court "must resolve all ambiguities and draw all reasonable inferences in favor of the party defending against the motion." *Eastway Constr. Corp. v. New York,* 762 F.2d 243, 249 (2d Cir.1985); *see also Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970); *Hathaway v. Coughlin,* 841 F.2d 48, 50 (2d Cir.1988); *Knight v. United States Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). But the court is to inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for the party," *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986), and to grant summary judgment where the nonmovant's evidence is merely colorable, conclusory, speculative or not significantly probative. *Id.* at 249–50, 106 S.Ct. at 2510–11; *Knight v. United States Fire Ins. Co.,* 804 F.2d at 12, 15; *Argus Inc. v. Eastman Kodak Co.,* 801 F.2d 38, 45 (2d Cir.1986), *cert. denied,* 479 U.S. 1088, 107 S.Ct. 1295, 94 L.Ed.2d 151 (1987). To determine whether the nonmoving party has met his or her burden, the court must focus on both the materiality and the genuineness of the factual issues raised by the nonmovant. As to materiality, "it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248, 106 S.Ct. at 2510. A dispute over irrelevant or unnecessary facts will not preclude summary judgment, *id.,* but the presence of unresolved factual issues that are material to the outcome of the litigation mandates a denial of the summary judgment motion. *See, e.g., Knight v. United States Fire Ins. Co.,* 804 F.2d at 11–12.

Once the nonmoving party has successfully met the burden of establishing the existence of a genuine dispute as to an issue of material fact, summary judgment must be denied unless the moving party comes forward with additional evidence sufficient to satisfy his or her ultimate burden under Rule 56. *See Celotex Corp. v. Catrett,* 477 U.S. at 330 n. 2, 106 S.Ct. at 2556 n. 2 (Brennan, J., dissenting). In sum, if the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1969)).

## II. The Pay Lag policy

### A. Resolution of Disputed Factual Issues

■ It is not the role of a judge to resolve disputed issues of material fact on a summary judgment motion. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 249, 106 S.Ct. at 2510 (in determining whether summary judgment is appropriate, "the judge's function is not himself to weigh the evidence and determine the truth of the matter"); *Rattner v. Netburn,* 930 F.2d 204, 209 (2d Cir.1991); *Phillips v. Kidder, Peabody & Co.,* 782 F.Supp. 854, 859 (S.D.N.Y.1991).

■ Plaintiffs allege that the Magistrate Judge erred in resolving factual disputes regarding whether the Pay Lag Policy imposed significant hardships on plaintiffs. Specifically, plaintiffs claim that the Magistrate Judge suggested that the effect of the Pay Lag Policy on the plaintiffs was insubstantial because "[p]laintiffs' food and shelter are supplied by the State." *See* Pls' Objs. at 4 n. 1 (quoting Report at 20). Plaintiffs maintain

that, in fact, DOCS had instituted a system in which inmates are expected to purchase necessities, and that the Magistrate Judge's disregard for this evidence vitiated his analysis of whether plaintiffs possessed a reasonable and legitimate expectation of prompt payment of their wages under the Due Process Clause.

In fact, the Magistrate Judge made no such finding with respect to the due process claim. In formulating their argument, plaintiffs have taken language from a portion of the Report out of context in which the Magistrate Judge was attempting to distinguish various cases relevant to the Contracts Clause claim. There is no evidence that this alleged "finding of fact" contaminated the Magistrate Judge's objectivity with respect to the due process issue in any way, and plaintiffs do not indicate the connection, if any, between this determination and the due process issue. Insofar as the Magistrate Judge could be deemed to have made a finding of fact with respect to this issue, there is no evidence that it has any impact whatsoever on the determination of the summary judgment issue. At any rate, since the Court reviews the Magistrate Judge's Report *de novo*, this Court will not adopt the Magistrate Judge's determination on this subject.

### B.  Due Process Claim

▮▮▮ In order to sustain an action for the deprivation of property without due process of law, a plaintiff must "first identify a property right, second show that the state has deprived him of that right, and third show that the deprivation was effected without due process." *Mehta v. Surles,* 905 F.2d 595, 598 (2d Cir.1990) (per curiam). There is, however, no constitutional right to prison wages and any such compensation is by the grace of the state. *Hrbek v. Farrier,* 787 F.2d 414, 416 (8th Cir.1986). Thus, in order to succeed on their claim, plaintiffs must initially establish a property interest in prison wages protected by the Fourteenth Amendment. Such property interests are, of course, not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings. These rules or understandings stem from an independent

source such as state law. *Paul v. Davis,* 424 U.S. 693, 709, 96 S.Ct. 1155, 1164, 47 L.Ed.2d 405 (1976); *Board of Regents v. Roth,* 408 U.S. 564, 576–77, 92 S.Ct. 2701, 2708–09, 33 L.Ed.2d 548 (1972). Thus, the Court must examine whether state law created a property interest in prison wages earned and the timely payment of such wages.

### 1.  Interest in Wages Earned

As a threshold matter, defendants claim that the Magistrate Judge erred in finding that there was any inmate property interest in wages at all. Specifically, defendants argue that since inmates have no right to a job, *Gill v. Mooney,* 824 F.2d 192 (2d Cir.1987), no right to be paid for their labor, *Manning v. Lockhart,* 623 F.2d 536, 538 (8th Cir.1980), and state law gives DOCS discretion over whether to pay inmates for their work, there is no property interest in wages at stake, *Davidson v. Kelly,* No. 92–CV–44S, slip op. at 11 (N.D.N.Y. March 30, 1994).

▮▮ The Magistrate Judge correctly separated from the question whether, as a general matter, inmates have a constitutional right to be paid wages from the issue implicated here, namely whether inmates have a right to wages already earned. Specifically, the Magistrate Judge found that the present case "does not present the question of whether inmates have a constitutional right to be paid wages. Here, they have already earned the wages and DOCS has acknowledged that this is money owed to the inmates." Report at 11. There is ample statutory guidance on the latter question. New York Correction Law Section 187 states, in part:

1.  Every inmate … may receive compensation for work performed during his or her imprisonment. …

2.  The department of correctional services shall adopt rules, subject to the approval of the director of the budget, for establishing in all of the state correctional facilities a system of compensation for the inmates confined therein. *Such rules shall provide for the payment of compensation to each inmate … based upon the work performed by such inmates.*

3. The department shall prepare graded wage schedules for inmates, which schedule shall be based upon classifications according to the value of work performed by each.... The rules of the department shall also provide for the establishment of a credit system for each inmate and the manner in which such earnings *shall be paid to the inmate or his dependents or held in trust for him until his release.*

4. Any compensation paid to an inmate under this article shall be based on the work performed by such inmate....

N.Y.Correct.Law § 187 (McKinney 1987). The statute thus imposes restrictions on the discretion afforded DOCS once a system of compensation for work performed by inmates has been established. This authority, coupled with the longstanding policy of paying inmates and the acknowledgement that inmates were owed the wages in question[3] vest the plaintiffs with some property interest in their wages for work already performed. *Cf. Board of Pardons v. Allen,* 482 U.S. 369, 377–78, 107 S.Ct. 2415, 2420–21, 96 L.Ed.2d 303 (1987); *Hewitt v. Helms,* 459 U.S. 460, 472, 103 S.Ct. 864, 871–72, 74 L.Ed.2d 675 (1983). Having determined that plaintiffs indeed possess a property interest in earned wages, the Court must next determine whether their interest extends to the timely payment of these wages.

### 2. Interest in Timely Payment

Plaintiffs argue that the Magistrate Judge mistakenly relied on *Christ Gatzonis Elec. Contractor, Inc. v. New York City School Constr. Auth.,* 23 F.3d 636, 637 (2d Cir.1994), and *S & D Maintenance Co. v. Goldin,* 844 F.2d 962, 963 (2d Cir.1988), in concluding that there is no property interest in the timely payment of wages. Specifically, they argue that these cases are inapplicable because payment was delayed because of a pending criminal investigation regarding the circumstances of employment.

In *Christ Gatzonis,* an electrical contractor claimed that the failure of a school construction authority to make prompt payments for work done on a contract constituted a deprivation of due process. In that case, the Court found that the refusal to pay promptly amounts owed under the contract did not constitute a deprivation of property without due process of law. *Christ Gatzonis,* 23 F.3d at 639–40 (where defendant had substantial latitude in making payments, plaintiff had at best a "claim to the amounts allegedly owed, but not to any 'prompt payment' thereof"). In particular, the claim failed because the plaintiff could not establish a constitutionally protected property interest in prompt payment under the contracts. *Id.* at 640–41. "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it.... He must, instead, have a legitimate claim of entitlement to it." *Id.* at 639 (quoting *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972)). The Court found that since no property interest was grounded in either the contracts in question[4] or New York statutory law, no such interest in prompt payment existed. Thus, the reason for the delay was not dispositive of the issue of whether there existed a property interest in the prompt payment of wages.

Similarly, in *S & D Maintenance,* 844 F.2d 962 (2d Cir.1988), a contractor brought an action pursuant to § 1983 claiming a denial of due process in connection with the city's withholding of payments pending criminal investigation of the circumstances under which one of the contracts was obtained. In that case, the Court found that:

A close analysis of the sources of the alleged property right in prompt payment reveals the absence of a clear entitlement.... In the absence of a prompt payment right grounded in the contracts or in the statutes [plaintiff] relies upon, we see no other basis in New York law on which such a right can be predicated.

---

**3.** Along these lines, the DOCS Budget Director testified that under the Pay Lag, "the State still has the obligation to pay the full amount of money out...." DiBello Dep. at 143.

**4.** "Even if the [contracts] could be read to mandate payment to [defendant], they do not furnish a basis for finding a property interest in *prompt* payment." *Christ Gatzonis,* 23 F.3d at 640.

*Id.* at 969. The Court went on to find that since there was no right to prompt payment, there was, *a fortiori,* no right to prompt payment pending a criminal investigation: "[Absent] a contractual or state law entitlement to prompt payment, we need not consider whether a prompt payment right, if otherwise established, could be interfered with, without some form of due process protection, by the State's power to defer payment pending an investigation to determine legality." *Id.* at 970 (citing *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 541, 105 S.Ct. 1487, 1492–93, 84 L.Ed.2d 494 (1985)). The precise reason for the delay of payment is of no moment, since the question is one of the scope of contractual and statutory authority. There was no federally protected right to prompt payment in these cases, and under N.Y.Correct.Law §§ 187(3) and 189, there is no such right here.[5]

■ Sections 187(3) and 189 of the New York Correction Law give DOCS the discretion to restrict inmates' access to, and use of, their funds until the time they are released:

> The amount of such compensation to the credit of any prisoner may be drawn by the prisoner during his imprisonment, only upon approval of the commissioner to aid dependent relatives of such prisoner, or for such other purposes as the commissioner may approve.... provided, however, that at the date of absolute discharge of any prisoner the balance as aforesaid shall be paid to such prisoner.

N.Y.Correct.Law § 189 (McKinney 1987). *See also* N.Y.Correct.Law § 187(3), *supra* ("[E]arnings shall be paid to the inmate or his dependents or held in trust for him until

his release."). Plaintiffs have pointed to no other state provision that would support a right to prompt payment. Thus, the Magistrate Judge was correct in finding no property interest in the prompt payment of wages.[6]

## C. The Takings Clause

The Takings Clause of the Fifth Amendment of the Constitution provides: "[N]or shall private property be taken for public use, without just compensation." U.S. Const. Amend. V. This prohibition is applicable to the conduct of the states through the Fourteenth Amendment. *Webb's Fabulous Pharmacies, Inc. v. Beckwith,* 449 U.S. 155, 160, 101 S.Ct. 446, 450, 66 L.Ed.2d 358 (1980).

■ The Takings Clause prevents the legislature from depriving private persons of vested property rights. *See Landgraf v. USI Film Prods.,* —— U.S. ——, ——, 114 S.Ct. 1483, 1497, 128 L.Ed.2d 229 (1994). Although there is no fixed formula for deciding when justice and fairness require that economic injuries caused by public action must be deemed a compensable taking, *Kaiser Aetna v. United States,* 444 U.S. 164, 175, 100 S.Ct. 383, 390, 62 L.Ed.2d 332 (1979) (quoting *Penn Cent. Transp. Co. v. New York City,* 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978)), several factors are considered in determining whether a governmental action constitutes a "taking," including: (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action. *Connolly v. Pension Benefit Guar. Corp.,* 475 U.S. 211, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986); *Ruckelshaus v. Monsanto Co.,* 467

---

5. Plaintiffs' attempt to distinguish the present case based on the length of delay is unpersuasive. The reasoning of the cases in question is based on the *existence* of a right to prompt payment, and not the actual time involved. Furthermore, as noted, N.Y.Correct.Law §§ 187(3) and 189 give DOCS adequate authority to delay inmates' use of their funds.

6. Plaintiffs' contention that the historical practice of paying inmates on a bi-weekly basis gives rise to an interest in prompt payment is incorrect, given the statutory language allowing DOCS to hold inmates' money in trust, to devise a system by which wages will be paid to inmates, and allowing the Commissioner discretion over

when and for what purposes inmates may have access to their funds. *See Connecticut Bd. of Pardons v. Dumschat,* 452 U.S. 458, 465, 101 S.Ct. 2460, 2464–65, 69 L.Ed.2d 158 (1981) ("A constitutional entitlement cannot 'be created—as if by estoppel—merely because a wholly and expressly discretionary state privilege has been granted generously in the past.' ") (quoting *Leis v. Flynt,* 439 U.S. 438, 444 n. 5, 99 S.Ct. 698, 701 n. 5, 58 L.Ed.2d 717 (1979)); *Plaza Health Laboratories, Inc. v. Perales,* 878 F.2d 577, 581 (2d Cir.1989) (no entitlement to benefits where the state retains discretionary authority to provide the benefits).

U.S. 986, 1005, 104 S.Ct. 2862, 2874, 81 L.Ed.2d 815 (1984); *PruneYard Shopping Center v. Robins,* 447 U.S. 74, 83, 100 S.Ct. 2035, 2042, 64 L.Ed.2d 741 (1980).

Plaintiffs claim that the Magistrate Judge erred in applying these factors. The Magistrate Judge found that plaintiffs lack a "reasonable investment-backed expectation" in bi-weekly payment of their wages, since prompt payment was not statutorily or contractually required, and plaintiffs were on notice that a certain portion of future wages would be withheld until their release. Plaintiffs assert the existence of a historically rooted expectation of timely compensation for their work, based on DOCS' longstanding practice of paying inmates on a bi-weekly basis for their work.

■ The Court agrees with the Magistrate Judge that this case involves no expectation of prompt payment sufficient to amount to a reasonable investment-backed expectation, and thus the policy does not give rise to a taking. Here, prompt payment was neither statutorily nor contractually constrained. Plaintiffs were on notice that wages could be withheld by the express warning in Section 187(3) of the New York Correction Law that payment of wages could be delayed until release. Plaintiffs can hardly argue that their reasonable investment-backed expectations are disturbed when DOCS acts in a manner expressly authorized by law at the time the policy was instituted. *See Ruckelshaus v. Monsanto Co.,* 467 U.S. at 1006–07, 104 S.Ct. at 2874–75, 81 L.Ed.2d 815 (1984) (chemical producer had no reasonable investment-backed expectation that trade secrets would not be used and disclosed by the government after the date of enactment of a federal statute that provided for that use and disclosure); *see also Loveladies Harbor, Inc. v. United States,* 28 F.3d 1171, 1177 (Fed.Cir. 1994) (reasonable investment-backed expectation requirement "was a way of limiting takings recoveries to owners who could demonstrate that they bought their property in reliance on a state of affairs that did not include the challenged regulatory regime"); *Resolution Trust Corp. v. Daddona,* 9 F.3d 312, 320–21 (3d Cir.1993) (borrowers had no reasonable investment-backed expectation that they could preserve their interest in encumbered land by asserting defenses based on alleged secret agreements against FDIC, where the law at the inception of the agreements precluded that result). Accordingly, plaintiffs' objections to the Magistrate Judge's Takings Clause analysis are denied.

### D. The Contracts Clause

■ The Contracts Clause of Article I, Section 10 of the Constitution provides that "[n]o State shall ... pass any ... Law impairing the Obligation of Contracts." In evaluating a claim that a state has violated the Contracts Clause, a court must determine whether the change in state law has "operated as a substantial impairment of a contractual relationship." *Energy Reserves Group, Inc. v. Kansas Power & Light Co.,* 459 U.S. 400, 411, 103 S.Ct. 697, 704, 74 L.Ed.2d 569 (1983); *Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234, 244, 98 S.Ct. 2716, 2722, 57 L.Ed.2d 727 (1978). This inquiry has three components: (1) whether there is a contractual relationship; (2) whether a change in law impairs that contractual relationship; and (3) whether the impairment is substantial. *General Motors Corp. v. Romein,* 503 U.S. 181, 185–86, 112 S.Ct. 1105, 1109, 117 L.Ed.2d 328 (1992). Where substantial impairment is found, the state must then demonstrate a legitimate public purpose for the regulation, such as remedying broad and general social or economic problems. *See Energy Reserves Group,* 459 U.S. at 411–12, 103 S.Ct. at 704–05, 74 L.Ed.2d 569 (1983).

Plaintiffs assert that the Pay Lag Policy impairs their contract rights in violation of the Contracts Clause. Plaintiffs contend that the Magistrate Judge reasoned incorrectly when he determined that: (1) plaintiffs have failed to establish the existence of a contractual relationship; and (2) even if they had an employment contract with DOCS, such contract did not include a term requiring timely payment of, and access to, their wages.

■ The Magistrate Judge was correct in finding that plaintiffs have failed to establish the existence of a contractual relationship. *See Davidson v. Kelly,* No. 92–CV–44S, slip

op. at 11 (N.D.N.Y. March 30, 1994) (finding no contractual relationship with the state in inmate's labor: "Plaintiff cannot bootstrap a position he holds at the discretion of the defendants into a contractual relationship protected by the United States Constitution."). The forms signed by inmates consenting to changes in work assignments contain no payment term, nothing about the conditions of the work and no mention of when payment will be made. *See* Report at 19.

Even if a contract exists, it does not provide for timely payment of wages. Plaintiffs argue that since courts frequently imply missing terms into contracts, a "reasonable time" for payment should be introduced into the present understanding or obligation. Plaintiffs' reliance on *Savasta v. 470 Newport Assocs.*, 82 N.Y.2d 763, 603 N.Y.S.2d 821, 822, 623 N.E.2d 1171 (1993) ("When a contract does not specify time of performance, the law implies a reasonable time."), *Total Spectrum Mfg., Inc. v. Frassetto*, 172 A.D.2d 747, 569 N.Y.S.2d 133, 133 (2d Dept.1991) (same), and *Young v. Whitney*, 111 A.D.2d 1013, 490 N.Y.S.2d 330, 331 (3d Dept.1985) (same), is misplaced. Under New York Correction Law Sections 187(3) and 189, DOCS has express discretion to hold the monies inmates earn in trust for the inmates, and DOCS retains discretion over how much and when to pay inmates.[7]

Since plaintiffs have failed to demonstrate that even if they had a contractual relationship with DOCS, such a contract included a provision for timely payment of wages, the Court need not address the issue of whether the asserted impairment was substantial, or whether the policy was supported by a substantial and legitimate governmental interest.

## III. The Disciplinary Surcharge Policy

### A. Due Process

■ In the context of individualized disciplinary proceedings, the Due Process Clause requires that there be: (1) advanced written notice of the disciplinary charges; (2) an opportunity to appear at the hearing and, when consistent with institutional safety and correctional goals, to call witnesses and present documentary evidence in defense; and (3) a written statement by the fact-finder of the evidence relied on and the reasons for the disciplinary action. *Wolff v. McDonnell*, 418 U.S. 539, 563–67, 94 S.Ct. 2963, 2978–80, 41 L.Ed.2d 935 (1974); *Patterson v. Coughlin*, 905 F.2d 564, 569 (2d Cir.1990); *Freeman v. Rideout*, 808 F.2d 949, 951–52 (2d Cir.1986), *cert. denied*, 485 U.S. 982, 108 S.Ct. 1273, 99 L.Ed.2d 484 (1988); *McCann v. Coughlin*, 698 F.2d 112, 122 (2d Cir.1983).

■ Inmates have the right to have disciplinary hearings conducted by an impartial, independent decision-maker. *See Vitek v. Jones*, 445 U.S. 480, 495, 100 S.Ct. 1254, 1265, 63 L.Ed.2d 552 (1980); *Russell v. Selsky*, 35 F.3d 55, 60 (2d Cir.1994) (citing *McKinnon v. Patterson*, 568 F.2d 930, 934 n. 3 (2d Cir.1977), *cert. denied*, 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978)). However, the decision-maker need not come from outside the prison. *Vitek v. Jones*, 445 U.S. at 496, 100 S.Ct. at 1265 (decision-maker conducting transfer hearing need not come from outside prison or hospital administration); *Powell v. Ward*, 542 F.2d 101, 103 (2d Cir.1976) (prison officials not disqualified from adjudicating alleged breaches of prison security solely because of their position).

Further, in the prison disciplinary context, the "degree of impartiality required of prison officials does not rise to the level of that required by judges generally." *Francis v. Coughlin*, 891 F.2d 43, 46 (2d Cir.1989); *see also Russell v. Selsky*, 35 F.3d at 60 (although it was a violation of DOCS regulations for a review officer to also sit as a hearing officer in the same case, it did not rise to the level of a federal constitutional due process violation); *Ruley v. Nevada Bd.*

---

7. Plaintiffs' argument that the Magistrate Judge failed adequately to distinguish *Association of Surrogates & Supreme Court Reporters v. New York State*, 940 F.2d 766 (2d Cir.1991), *cert. denied*, 502 U.S. 1058, 112 S.Ct. 936, 117 L.Ed.2d 107 (1992), in which the Court overturned a pay lag, relying on the fact that a specific term in the plaintiffs' collective bargaining agreement required that payment based on ten days work be made bi-weekly, is not persuasive. Here, in addition to the absence of a contractual relationship, there is nothing resembling the bi-weekly payment contractual provision present in that case.

*of Prison Commrs.*, 628 F.Supp. 108, 112–13 (D.Nev.1986) ("A substantial showing of bias must be made to disqualify a hearing officer in an administrative proceeding or to justify a ruling that a hearing was unfair.").

Plaintiffs claim that their due process guarantees were violated because the Disciplinary Surcharge Policy violated their right to procedural due process by introducing bias into the disciplinary system. Specifically, plaintiffs contend that because of recent staff layoffs and the linking in the media of the Disciplinary Surcharge with the prevention of further layoffs of prison personnel, the Disciplinary Surcharge on Tier II and Tier III infractions gave DOCS employees at all levels of the disciplinary system an improper pecuniary motive to issue more MRs and guilty verdicts at those tiers.

■ Plaintiffs also contend that the Magistrate Judge erred by resolving disputed factual questions regarding the amount of discretion DOCS grants its employees throughout the disciplinary system. Plaintiffs contend that DOCS employees "can easily channel MRs away from Tier I hearings (where no Disciplinary Surcharge can be assessed) and toward Tier II and III hearings (where the Disciplinary Surcharge must be assessed upon a finding of guilt)." Pls.' Objs. at 16. According to plaintiffs, the Magistrate Judge made a "finding" that the discretion of reviewing officers is limited. The Magistrate Judge stated that "[t]he discretion of the reviewing officer in assigning the tier level is limited by guidelines set forth in [N.Y.Comp. Codes R. & Regs. tit. 7] §§ 270.1 and 270.2 . . . ." Report at 22. Taken in context, the Magistrate Judge's statements were not in error. The Magistrate Judge noted in the sentence preceding the one in question that "many of the violations allow for hearings in a range of tiers," and was merely noting that there are some limitations on the tiers to

which certain MRs can be assigned, a fact that is clear from N.Y.Comp.Codes R. & Regs. tit. 7, § 270.2, and not contested by plaintiffs.[8] This statement, in itself, was not a finding that officers were incapable of channeling MRs toward hearings where the Disciplinary Surcharge would be imposed. At any rate, this Court reviews the decision of the Magistrate Judge *de novo,* and chooses not to adopt any broader interpretation of the phrase.

Plaintiffs next assert that the Magistrate Judge erroneously held that DOCS "clarified" how the surcharge proceeds are used, correcting the impression left by news articles indicating that the Disciplinary Surcharge would prevent impending layoffs of DOCS staff. The Magistrate Judge stated that although it was initially unclear whether funds from the Disciplinary Surcharge would be used to prevent layoffs, DOCS subsequently "clarified" the purposes of the Disciplinary Surcharge. Plaintiffs argue that "[t]he relevant fact is not whether the surcharge revenues are deposited in the State's general fund ... but whether DOCS ever told its staff (or encouraged its staff to believe) that the surcharge revenues went to keep their jobs." [9] Pls.' Objs. at 19–20. Finally, plaintiffs assert that even if DOCS employees did not have a pecuniary interest in frequent assessments of the Disciplinary Surcharge, DOCS has an institutional interest in ensuring that the Disciplinary Surcharge is assessed frequently.

■ The Magistrate Judge correctly found that any interest created by the Disciplinary Surcharge was far too attenuated to give rise to a due process violation. The Magistrate Judge correctly distinguished the cases cited by plaintiffs, *Gibson v. Berryhill,* 411 U.S. 564, 578, 93 S.Ct. 1689, 1697–98, 36 L.Ed.2d 488 (1973) (adjudicatory panel of

---

8. For example, under N.Y.Comp.Codes R. & Regs. tit. 7, § 270.2, violation of the offense described as "Inmates shall not exceed any time limit imposed on any work release or furlough-type program" must be classified as a Tier II or Tier III offense.

9. Since the relevant inquiry here is the question of potential bias in the disciplinary process, plaintiffs maintain that the belief of DOCS em-

ployees regarding use of the funds is more significant than the actual use of the funds. Thus, like testimony admitted because not technically hearsay, it is significant not for the truth of the matter asserted, but as establishing or reflecting the state of mind of the hearer. This claim reflects the truism that decision-makers are motivated by their beliefs about the facts, rather than the actual facts.

optometrists would possibly benefit from reduced competition that would result if the panel enjoined a large competitor from practicing optometry in their state), and *Tumey v. Ohio,* 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927) (town mayor who levied Prohibition Act fines personally received compensation based on the number of convictions he secured, and his village retained half of the fines he assessed), finding that "the bias that the Supreme Court perceived in these two cases is not at all similar to the remote possibility of bias that is claimed to exist in this action." Report at 32. The Magistrate Judge instead correctly found the present case similar to *Dugan v. Ohio,* 277 U.S. 61, 48 S.Ct. 439, 72 L.Ed. 784 (1928). In *Dugan,* a mayor played a role as one of five members of a city commission which voted on appropriations, including the mayor's salary. The mayor also served in a quasi-judicial role in unlawful liquor possession cases, and half the amount of the fines he assessed were paid into the city treasury. This interest was found too remote to raise an inference of impermissible bias, stating that "[t]here is no reason to infer on any showing that failure to convict in any case or cases would deprive him of or affect his fixed compensation." *Dugan,* 277 U.S. at 65, 48 S.Ct. at 440.

Similarly, in *Wolkenstein v. Reville,* 694 F.2d 35 (2d Cir.1982), *cert. denied,* 462 U.S. 1105, 103 S.Ct. 2452, 77 L.Ed.2d 1332 (1983) (superintendent of a school system made determinations whether strike by teachers was illegal, subjecting them to fines to be paid to the municipality), and *Hammond v. Baldwin,* 866 F.2d 172, 177 (6th Cir.1989) (state agency's approval of issuance of permits did not violate due process absent direct pecuniary advantage to particular decisions) ("the entire government of a state cannot be disqualified from decisionmaking on grounds of bias when all that is alleged is a general bias in favor of the alleged state interest or policy"), no due process violations were found because the interest in a particular result was too attenuated. The Magistrate Judge correctly found that "there has been no evidence that a single DOCS employee was ever under the impression that frequent, or any, convictions resulting in the imposition of the surcharge would save jobs," Report at 27, and that

"plaintiffs have failed to show that DOCS employees at Green Haven even read the articles proffered or, that if they did, that they believed the news reporters' statements with respect to jobs to be true." Report at 29. Thus, the Magistrate Judge correctly found that plaintiffs had failed to meet their burden of establishing a material factual dispute concerning bias in the disciplinary system.

Plaintiffs next argue that the Magistrate Judge erroneously held that DOCS' confiscation of inmate funds without express statutory authorization does not violate due process. Specifically, plaintiffs claim that the Magistrate Judge misanalyzed their argument that state officials violate the Due Process Clause when they impose a forfeiture or confiscation of property without explicit statutory authorization. Plaintiffs rely principally on *Sell v. Parratt,* 548 F.2d 753, 758–59 (8th Cir.), *cert. denied,* 434 U.S. 873, 98 S.Ct. 220, 54 L.Ed.2d 152 (1977), for the proposition that such forfeitures and confiscations violate due process. In *Sell,* the court stated:

we think that the district court correctly held that an administrative agency has no right without underlying statutory authority to prescribe and enforce forfeitures of property as punitive measures for violations of administrative rules and regulations, and that when an agency does so, it violates the due process clause of the fourteenth amendment.

*Id.* at 759.

The Magistrate Judge correctly rejected plaintiffs' claim that the Disciplinary Surcharge constitutes a forfeiture without statutory authorization. First, the Magistrate Judge properly found that the scope of the authority of a state agency such as DOCS is a question of state law and therefore not within the jurisdiction of this Court. *See Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89, 117, 104 S.Ct. 900, 917, 79 L.Ed.2d 67 (1984) ("[A] federal suit against state officials on the basis of state law contravenes the Eleventh Amendment when ... the relief sought ... has an impact directly on the State itself."). This was recognized in the factually similar *Davidson v. Kelly,* No.

92–CV–44S, slip op. at 14 (W.D.N.Y. March 30, 1994), where a plaintiff who sought injunctive relief discontinuing the Disciplinary Surcharge, punitive damages and reimbursement of monies taken under the policies, found his claim precluded by the Eleventh Amendment. Only where an agency lacks any delegated power and acts "without any authority whatever" does an exception exist to this Eleventh Amendment jurisdictional bar. *See Pennhurst*, 465 U.S. at 102–03 n. 11, 104 S.Ct. at 927 n. 11.

Here, there appears to be adequate state authority for the Disciplinary Surcharge. New York Correction Law § 112(1) provides:

> The commissioner of correction shall have the superintendence, management and control of the correctional facilities in the department and of the inmates confined therein, and of all matters relating to the government, discipline, policing, contracts and fiscal concerns thereof.

N.Y.Correct.Law § 112(1) (McKinney 1987). New York Correction Law § 138(3) provides: "facility rules shall state the range of disciplinary sanctions which can be imposed for violation of each rule." N.Y.Correct.Law § 138(3) (McKinney 1987). Finally, New York Corrections Law § 137(2) states: "The commissioner shall provide for such measures as he may deem necessary or appropriate for the safety, security and control of correctional facilities and the maintenance of order therein." N.Y.Correct.Law § 137(2) (McKinney 1987). Given these provisions, the Disciplinary Surcharge cannot be said to have been enacted "without any authority whatever." *Pennhurst*, 465 U.S. at 102–03 n. 11, 104 S.Ct. at 909–10 n. 11; *see also Minotti v. Lensink*, 798 F.2d 607, 609 (2d Cir.1986), *cert. denied*, 482 U.S. 906, 107 S.Ct. 2484, 96 L.Ed.2d 376 (1987).[10] The statute in *Sell* placed substantive limits on the penalties which the prison system could impose. Here, however, the statute granting disciplinary authority to the Commissioner places no such limitation on his discretion. *Cf. Savko v. Rollins*, 749 F.Supp. 1403, 1414 (D.Md. 1990) (broad language of statute authorizing

prison officials to promulgate disciplinary rules was sufficient authority under which to promulgate disciplinary rules governing personal property held by inmates), *aff'd*, 924 F.2d 1053 (4th Cir.1991).

In addition, the Magistrate Judge correctly noted that the Disciplinary Surcharge in the present case is not a "forfeiture" without due process of law. The Disciplinary Surcharge is imposed only after a hearing consistent with due process requirements. *Sell*, in contrast, involved summary confiscations without a hearing or administrative review.

### B. Equal Protection

#### 1. Similarly Situated

■ The Equal Protection Clause of the Fourteenth Amendment requires that persons similarly situated be treated in the same manner. *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985); *Zahra v. Town of Southold*, 48 F.3d 674, 683 (2d Cir.1995). While equal protection does not require that all persons be dealt with in an identical fashion, it does require that a distinction made have some relevance to the purpose for which the classification is made. *Baxstrom v. Herold*, 383 U.S. 107, 111, 86 S.Ct. 760, 762–63, 15 L.Ed.2d 620 (1966); *see also Liberta v. Kelly*, 839 F.2d 77, 82 (2d Cir.), *cert. denied*, 488 U.S. 832, 109 S.Ct. 89, 102 L.Ed.2d 65 (1988) ("the equal protection clause does not . . . 'require things which are different in fact . . . to be treated in law as thought they were the same'") (quoting *Rinaldi v. Yeager*, 384 U.S. 305, 309, 86 S.Ct. 1497, 1500, 16 L.Ed.2d 577 (1966)).

Plaintiffs initially object to the finding by the Magistrate Judge that the regulations in question may provide for a waiver in some cases. To this end, the Magistrate Judge cites N.Y.Comp.Codes R. & Regs. tit. 7, §§ 253.9 (disciplinary hearings) and 254.9 (superintendent's hearings), which provide in identical language: "At any time during which a penalty imposed pursuant to a disciplinary [superintendent's] hearing is in effect, the superintendent may reduce the pen-

---

**10.** The imposition of a Disciplinary Surcharge has been examined by New York courts and found to have adequate justification in state law.

*See, e.g., Allah v. Coughlin*, 190 A.D.2d 233, 599 N.Y.S.2d 651 (3d Dept.1993).

alty." N.Y.Comp.Codes R. & Regs. tit. 7, §§ 253.9 & 254.9. The Magistrate Judge also considered the fact that while plaintiffs have not alleged that a single member of the class ever requested a waiver of the Disciplinary Surcharge because of indigency, defendants have stated that in a particular case of hardship, they might grant such a waiver. Defs.' Interrog.Resp. at 52. Plaintiffs counter that the issue of the regulations in question was raised *sua sponte* by the Magistrate Judge, and that the term "penalty" mentioned therein does not refer to a Disciplinary Surcharge. Since there appears to be some dispute as to the scope of the term "penalty," we find these provisions an insufficient ground, standing alone, for summary judgment on this point.

■ Even if the Magistrate Judge's findings with respect to N.Y.Comp.Codes R. & Regs. tit. 7, §§ 253.9 and 254.9 are disregarded, however, no violation of equal protection exists in the present case. The inmates here are clearly not similarly situated to the unincarcerated citizens who may obtain indigency waivers for Motor Vehicle and Parks laws surcharges on whom plaintiffs rely. The constitutional rights of prisoners are necessarily limited by the fact of their incarceration and the goal of safeguarding institutional security. *See Bell v. Wolfish,* 441 U.S. 520, 545–46, 99 S.Ct. 1861, 1877–78, 60 L.Ed.2d 447 (1979) ("[t]he fact of confinement as well as the legitimate goals and policies of the penal institution limits [inmates'] retained constitutional rights"); *Chesney v. Adams,* 377 F.Supp. 887 (D.Conn. 1974), *aff'd,* 508 F.2d 836 (2d Cir.1975) (prisoners and non-prisoners need not be treated identically). Since the Equal Protection Clause does not forbid states from treating differently situated individuals differently, *see Danese v. Knox,* 827 F.Supp. 185, 196 (S.D.N.Y.1993), there is no equal protection violation.

### 2. Legitimate Penological Interest

■ In order to show that a policy is violative of equal protection guarantees in the prison context, a party must demonstrate that the policy is not reasonably related to a legitimate penological interest. *Turner v.*

*Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 2261–62, 96 L.Ed.2d 64 (1987); *City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 439–40, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985); *Police Dep't of City of Chicago v. Mosley,* 408 U.S. 92, 95, 92 S.Ct. 2286, 2290–91, 33 L.Ed.2d 212 (1972); *Benjamin v. Coughlin,* 905 F.2d 571, 575 (2d Cir.), *cert. denied,* 498 U.S. 951, 111 S.Ct. 372, 112 L.Ed.2d 335 (1990). When applying this test, "if any state of facts reasonably can be conceived that would sustain [the policy], the existence of that state of facts … must be assumed." *United States R.R. v. Fritz,* 449 U.S. 166, 174, 101 S.Ct. 453, 459, 66 L.Ed.2d 368 (1980) (quoting *Lindsley v. Natural Carbonic Gas Co.,* 220 U.S. 61, 78–79, 31 S.Ct. 337, 340–41, 55 L.Ed. 369 (1911)).

■ Plaintiffs argue that the differential treatment of inmates and non-inmates violates equal protection. Plaintiffs argue that the Magistrate Judge erred by analyzing whether the Disciplinary Surcharge Policy itself was rationally related to a legitimate penological interest, rather than whether the denial of an indigency waiver to inmates when such waivers are provided to non-inmates for the same offenses bears a rational relationship to legitimate penological interests. This is a distinction without a difference, since the application of a lesser level of scrutiny in prison inmate cases arises from the differences between inmate and non-inmate populations. At any rate, defendants proffer two justifications for the policy: that the Disciplinary Surcharge Policy acts as an incentive for inmates to behave, and that it raises revenue for the state and helps defray the costs of running the disciplinary system. These reasons, which must be accepted as true under *Fritz,* 449 U.S. at 174, 101 S.Ct. at 459, adequately demonstrate a legitimate penological interest in the policy.

### CONCLUSION

For the aforementioned reasons, the Report and Recommendation issued by Magistrate Judge Katz on May 23, 1995 is accepted in accordance with 28 U.S.C. § 636(b), and defendants' motion for summary judgment

**1324**

dismissing the complaint is granted, pursuant to Federal Rule of Civil Procedure 56.